580 A.2d 127 (1990)
Irene L. WANZER, Individually and as Personal Representative of the Estate of James R. Lee, Appellant,
v.
DISTRICT OF COLUMBIA, Appellee.
No. 88-386.
District of Columbia Court of Appeals.
Argued March 21, 1989.
Decided September 28, 1990.
*128 Edward S. Horowitz, Greenbelt, Md., for appellant.
Donna M. Murasky, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.
Before BELSON, TERRY, and STEADMAN, Associate Judges.
TERRY, Associate Judge:
Although there are privately owned ambulance companies which do business in the District of Columbia, most ambulance service is provided by the District of Columbia Fire Department through its Emergency Medical Service (EMS). To request an EMS ambulance, a person typically dials the emergency "911" telephone number. At about 3:30 a.m. on December 27, 1986, James Lee did just that. The conversation between Mr. Lee and the dispatcher went as follows:
DISPATCHER: Ambulance.
LEE: Yes, could you send an ambulance to 2930 10th Street, N.E., please?
DISPATCHER: Is it a house or apartment, sir?
LEE: I have a terrific headache.
DISPATCHER: Is it a house or apartment, sir?
LEE: House.
DISPATCHER: What is the problem now?
LEE: I have terrific headaches. I never had headaches in my life.
DISPATCHER: Have you taken anything for them?
LEE: No.
DISPATCHER: How long have you had these headaches?
LEE: About an hour.
DISPATCHER: Then you need an ambulance and you haven't tried to take an aspirin?
LEE: No, I haven't.
DISPATCHER: Don't you think you should go takeyou know, wouldn't that be logical?
LEE: Okay, all right. [END OF CALL]
No ambulance was dispatched. Instead, about nine hours later, Annie Agee, Mr. Lee's neighbor, called 911 and requested that an ambulance be sent to Lee's address because he still had terrible headaches and was experiencing difficulty breathing. *129 Within a minute, an ambulance was on its way. It took Mr. Lee to Washington Hospital Center, where he was diagnosed as having suffered a stroke. He died two days later.
Appellant Irene Wanzer, who is Mr. Lee's daughter, filed suit against the District of Columbia on her own behalf under the wrongful death statute, D.C.Code § 16-2701 (1989), and as personal representative of her father's estate under the District's survival statute, D.C.Code § 12-101 (1989). In her complaint she alleged that the District government breached its duty to provide ambulance service to her father by negligently failing to train or supervise the EMS dispatcher who talked to her father on the night he called 911. She alleged further that as a direct and proximate cause of that breach her father endured pain, suffering, and emotional distress, and ultimately died. She also claimed personal pecuniary and non-pecuniary losses. In her complaint she asked for both compensatory and punitive damages.
The District moved to dismiss the complaint under Super.Ct.Civ.R. 12(b)(6) for failure to state a claim on which relief could be granted. The crux of its argument was that a breach of the duty owed to Lee by the EMS was not actionable in tort. After a hearing, the trial court granted the District's motion on the ground that the facts alleged in the complaint were insufficient as a matter of law to state a cause of action. On appeal, appellant asks the court to establish a legal basis on which she can proceed in her suit against the District.

I
It is well settled that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957). Moreover, in considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must view the complaint in the light most favorable to the plaintiff and must accept as true each of the allegations made in the complaint. Vicki Bagley Realty, Inc. v. Laufer, 482 A.2d 359, 364 (D.C.1984); McBryde v. Amoco Oil Co., 404 A.2d 200, 202 (D.C. 1979); see also Super Ct.Civ.R. 8(f) ("All pleadings shall be so construed as to do substantial justice"). In the case at bar, therefore, we accept as true appellant's allegations that the EMS dispatcher negligently failed to dispatch an ambulance when Mr. Lee called; that this failure was a departure from accepted EMS protocols and procedures;[1] and that Mr. Lee would have survived his stroke if an ambulance had been sent when first summoned. See Haymon v. Wilkerson, 535 A.2d 880, 882 (D.C.1987). Consequently, for Rule 12(b)(6) purposes appellant has established proximate cause and damages. Her complaint was dismissed, however, because she failed as a matter of law to establish that the District owed a special duty to Mr. Lee. See Turner v. District of Columbia, 532 A.2d 662 (D.C.1987); Morgan v. District of Columbia, 468 A.2d 1306 (D.C.1983) (en banc); Platt v. District of Columbia, 467 A.2d 149 (D.C.1983); Warren v. District of Columbia, 444 A.2d 1 (D.C.1981) (en banc). Whether a special relationship existed between the EMS and Mr. Lee, giving rise to a special duty, is the question we must answer. However, since this case and its *130 two companions[2] are the first cases involving the ambulance service to come before us on this question, we must first decide whether the special duty analysis even applies to claims involving the EMS.

II
It is generally held that "[t]he institution of [a publicly operated] emergency ambulance service is ... a service kindred to the police or fire service. This type of service is incident to the police power of state: i.e., to protect the health, safety, and general welfare of its citizens." Ayala v. City of Corpus Christi, 507 S.W.2d 324, 328 (Tex.Civ.App.1974) (citations omitted); see Thornton v. Shore, 233 Kan. 737, 741, 666 P.2d 655, 659 (1983); Smith v. City of Lexington, 307 S.W.2d 568 (Ky.Ct.App. 1957); Ross v. Consumers Power Co., 420 Mich. 567, 651, 363 N.W.2d 641, 676 (1984);[3]King v. Williams, 5 Ohio St.3d 137, 449 N.E.2d 452, 455 (1983); cf. O'Neil & Hearne v. Bray's Administratix, 262 Ky. 377, 379, 90 S.W.2d 353, 355 (Ky.Ct. App.1936) (municipally owned ambulances, like police and fire vehicles, are exempt by statute from speed limits, but privately owned ambulances are not). There are at least three reasons for the almost universal acceptance of this principle.[4] Several state statutes link government-operated ambulance services to police or fire protection, or both, as services which safeguard the life and health of the citizenry. See, e.g., Alaska Stat. § 29.35.130(d)(1) (1986) ("`emergency services' means services provided by law enforcement agencies, fire departments, [and] ambulance services"); Ark. Stat.Ann. § 14-14-708(c)(1) (1987) (emergency services include ambulance, fire prevention, and fire protection services); Cal. Health & Safety Code § 13801 (Deering 1989 Supp.) ("local provision of fire protection services, rescue services, emergency medical services, [and] ambulance services... is critical to the public peace, health, and safety of the state"); Md.Ann.Code art. 38A, § 45B(a)(1)-(2) (1986) (state fund established to promote the "delivery of effective and high quality fire protection, rescue, and ambulance services to the citizens of this State"); Minn.Stat.Ann. § 403.03 (West 1989 Supp.) (911 emergency number to be used primarily for "police, firefighting and emergency medical and ambulance services"). Where available, the easily remembered 911 emergency number connects a caller with the fire department, the police department, and the ambulance service, thereby providing an efficient and effective means of summoning one or more of these vital and integrally related services to the scene of a calamity. See, e.g., Benedict v. State, 494 So.2d 865, 866 (Ala.Crim.App. 1986); People v. Amato, 193 Colo. 57, 58, 562 P.2d 422, 423 (1977); State v. Vincik, 398 N.W.2d 788, 790 (Iowa 1987); Ross v. Consumers Power Co., supra, 420 Mich. at 651, 363 N.W.2d at 676; Maple v. City of Omaha, 222 Neb. 293, 300-304, 384 N.W.2d 254, 260-261 (1986). Lastly, these three emergency services are so interconnected and so vital to a community's health and safety that they are typically considered in tandem when assessing the effects of municipal land annexations on governmental services. See, e.g., In re City of Lenexa, 232 Kan. 568, 584, 657 P.2d 47, 62 (1983); City of Louisville v. Fiscal Court of Jefferson County, 623 S.W.2d 219, 221 (Ky.1981); City of Town and Country v. St. Louis County, 657 S.W.2d 598, 601 (Mo.1983).
*131 Appellant contends, however, that the District's ambulance service is distinguishable from its police and fire service because a user fee is charged for ambulance service, D.C.Code § 4-316 (1988), whereas no such fee is charged for police or fire protection. From this fact appellant draws the conclusion that the District's ambulance service should be subject to the same tort liability as privately owned ambulance companies. We disagree.
For many years emergency ambulance service was provided free of charge to anyone who needed it. In 1976, however, a fee arrangement was recommended by the Mayor as a means of obtaining reimbursement from Medicare, Medicaid, and private insurance plans, when available, for part of the cost of ambulance runs. See Council of the District of Columbia, Memorandum Re Amendments to Revenue Act: User Charges, Attachment D-3 (November 18, 1976) [hereafter "Memo Re Revenue Act Amendments"]. The Council accepted the recommendation and authorized the Mayor to set a reasonable fee to cover the cost of providing emergency medical services, with two restrictions: that no one be denied such services because of inability to pay, and that no one be asked about ability to pay at the time the services are requested.[5] D.C.Code § 4-316 (1988). The fee was set at $35.00. Mayor's Order No. 77-173, Emergency Ambulance Transportation Fee, 1977 D.C.Stat. 1056. From its inception, however, this fee was expected to generate only enough revenue to cover about twenty-five percent of the total cost of maintaining the EMS; the remaining seventy-five percent of the cost was to be subsidized from the general fund. See Memo Re Revenue Act Amendments, supra.
As a division of the Fire Department, the EMS is charged with protecting the lives of all the citizens of the District of Columbia, in normal times as well as times of crisis. See Mayor's Order No. 81-233a, Organization of the Fire Department § II(A) (November 9, 1981). In light of this function, and given the heavy subsidy provided to the EMS from general revenues and the fact that by statute no one may be denied service because of inability to pay, we hold that operation of the EMS is an exercise of the District's police power to further the general health and welfare, user fees notwithstanding. See, e.g., Gold Cross Ambulance v. City of Kansas City, 538 F.Supp. 956, 964-969 (W.D.Mo.1982) (ambulance company supervised and subsidized by city), aff'd, 705 F.2d 1005 (8th Cir.1983), cert. denied, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); City of Newark v. United States, 149 F.Supp. 917, 922 (D.N.J. 1957) (ambulance service operated by city hospital), aff'd, 254 F.2d 93 (3d Cir.1958); Watson v. City of Atlanta, 136 Ga. 370, 71 S.E. 664 (1911) (ambulance service operated by non-profit public hospital); State ex rel. New Liberty Hospital District v. Pratt, 687 S.W.2d 184, 186 (Mo.1985) (public hospital); City of Memphis v. Bettis, 512 S.W.2d 270, 272-274 (Tenn.1974) (ambulance service); Mejia v. City of San Antonio, 759 S.W.2d 198 (Tex.Ct.App.1988) (city-operated emergency medical service);[6]Edwards v. City of Portsmouth, 237 Va. 167, 170, 375 S.E.2d 747, 749-750 (1989) (ambulance service). See generally 57 AM.JUR.2D Municipal, County, School and State Tort Liability §§ 97-99 (1988). We therefore conclude that the District's public ambulance service is equivalent to its police and fire protection, so that the special duty analysis set forth in such cases as Morgan (police), Platt (fire), and Warren (police) must be applied to the case at bar as well.

III
To obtain reversal, appellant must show that the District of Columbia had a special relationship with her father so that it owed him a special duty of care beyond *132 the general duty owed to the public at large; absent a special relationship, the District cannot be held liable. Turner v. District of Columbia, supra, 532 A.2d at 666; Platt v. District of Columbia, supra, 467 A.2d at 151. "Such a relationship can be established either by `direct contact or continuing contact between the victim and the governmental agency or official' ... or by a statute that prescribes `mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole.'" Turner v. District of Columbia, supra, 532 A.2d at 667 (citations omitted); see also Warren v. District of Columbia, supra, 444 A.2d at 3-4; Westminster Investing Corp. v. G.C. Murphy Co., 140 U.S.App.D.C. 247, 434 F.2d 521 (1970). See generally 57 AM.JUR.2D Municipal, County, School and State Tort Liability §§ 140-143 (1988); 18 E. McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS §§ 53.03-53.04d (3d ed. 1984 & 1988 Supp.). Appellant has failed to allege either basis for liability.
A one-time call to 911 for help does not establish a special relationship. Morgan, supra, 468 A.2d at 1313. It is not enough to allege ineptitude, even shameful and inexcusable ineptitude, by a municipal agency in failing to respond adequately to a call for help. To give rise to a special relationship, the agency's response to the private party must in some demonstrable way exceed the response generally made to other members of the public. See Turner, supra, 532 A.2d at 673; Warren, supra, 444 A.2d at 4; see also Chandler v. District of Columbia, 404 A.2d 964, 966 (D.C. 1979). Even a series of contacts over a period of time between a public agency and an injured or endangered person is not enough to establish a special relationship, absent some showing that the agency assumed a greater duty to that person than the duty owed to the public at large. See Morgan, supra, 468 A.2d at 1316. If it were otherwise, then the city would be potentially liable for "every oversight, omission, or blunder" of its officialsa liability which potentially could so deplete the resources necessary to provide police protection, fire protection, and ambulance service as to result in the elimination of those services altogether. Turner, supra, 532 A.2d at 673, quoting Morgan, supra, 468 A.2d at 1311.
In the case at bar, Mr. Lee called the emergency 911 number when he experienced severe headaches. Generically, however, his call was no different from the hundreds of other calls received every day by the EMS. He neither asked for, nor would he in all likelihood have received, a response different in any way from the response generally made to such requests, i.e., the dispatch of an ambulance. Even if the dispatcher erred in suggesting to Lee that he first try taking aspirin for his headache,[7] the District nonetheless may not be held liable for the dispatcher's failure to send an ambulance to assist Lee in dealing with what turned out to be a life-threatening illness, because the District owed him no special duty greater than that owed to the public at large. Klahr v. District of Columbia, 576 A.2d 718, 719-720 (D.C. 1990); Morgan, supra, 468 A.2d at 1315; Platt, supra, 467 A.2d at 152; see also Maple v. City of Omaha, supra, 222 Neb. at 298-300, 384 N.W.2d at 259-260.[8]
Finally, unlike the plaintiff in Turner v. District of Columbia, supra, appellant cannot show that her father belonged to a discrete class of persons for whom the EMS is statutorily mandated to act. See Hines v. District of Columbia, supra note 2, 580 A.2d at 138. In Turner this court held that a statute, the Child Abuse Prevention Act, "imposes upon certain public officials specific duties and responsibilities which are intended to protect a narrowly defined and otherwise helpless class of persons: *133 abused and neglected children." 532 A.2d at 668; see also DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 109 S.Ct. 998, 1010-1011, 103 L.Ed.2d 249 (1989) (Brennan, J., dissenting). If that duty is breached, then "that statutorily protected class suffers in a way uniquely different from the public at large." Turner, supra, 532 A.2d at 668. Breach of this special duty to any member of the protected class is actionable in tort. Id. at 675. Appellant argues that the EMS protocols and procedures, see note 1, supra, also impose a special duty on the District for the benefit of a protected class, namely, sick people. Her argument is without legal support.
Agency protocols and procedures, like agency manuals, do not have the force or effect of a statute or an administrative regulation. Rather, they provide officials with guidance on how they should perform those duties which are mandated by statute or regulation. See, e.g., Schweiker v. Hansen, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (Social Security Administration [SSA] Claims Manual "has no legal force, and it does not bind the SSA"); Jacobo v. United States, 853 F.2d 640, 641-642 (9th Cir.1988) (failure of naval officer to comply with naval manual will not support a negligence claim); Stath v. Williams, 174 Ind.App. 369, 367 N.E.2d 1120, 1124-1125 (1977) (no civil liability when coroner complied with statute, but allegedly violated internal protocols for performing autopsy and investigation); Mervin v. Magney Construction Co., 416 N.W.2d 121, 124-125 (Minn.1987) (construction procedures prescribed by Army Corps of Engineers manual cannot establish a standard of care because the manual was never subjected to the scrutiny of the legislative process or the rulemaking safeguards of the Administrative Procedure Act). In the instant case, therefore, we hold that the EMS procedures and protocols are equivalent to the Metropolitan Police Department's "general orders," which, unlike a statute, cannot create a special duty to a protected class. Morgan v. District of Columbia, supra, 468 A.2d at 1317-1318; accord, Isaksson v. Rulffes, 135 A.D.2d 611, 522 N.Y.S.2d 189 (1987).

IV
There being no legal basis to impose liability on the District on the facts alleged, the order dismissing appellant's complaint for failure to state a claim is
Affirmed.
NOTES
[1] The Fire Department has developed "general procedures" to aid dispatchers in prioritizing requests for ambulance service. See D.C. Fire Department, Priority Dispatch Questioning for Emergency Medical Service Calls (June 1986) (unpublished and unpaginated). According to these procedures, if a caller describes the patient as having headaches but conscious, breathing normally, and not having fainted or suffered a recent head injury, then the call should receive "priority 4" status. See id. under "Headache." According to the Department's protocols, "priority 4" is the lowest priority, i.e., the dispatcher is instructed to send only an ambulance (as opposed to an ambulance, engine company, and medic unit), and the ambulance is supposed to arrive within twenty minutes (as opposed to six minutes for priority categories 1, 2, and 3). See D.C. Fire Department, Dispatch Priorities and Protocols for Emergency Medical Service Incidents (1986-1987) (unpublished).
[2] This is one of a group of three related cases involving the District of Columbia ambulance service. They were argued on the same day before the same division of the court, and they are being decided simultaneously. The other cases are Hines v. District of Columbia, 580 A.2d 133 (D.C.1990), and Johnson v. District of Columbia, 580 A.2d 140 (D.C.1990). The three opinions, although there may be some inevitable overlap among them, are intended to be complementary and designed to be read together.
[3] After Ross was decided, the Michigan legislature revised the governmental immunity statute. See Peters v. Bay Fresh Start, Inc., 161 Mich.App. 491, 497, 411 N.W.2d 463, 466 (1987). The statutory revision, however, does not affect the proposition for which we are citing Ross.
[4] Appellant cites no authority to the contrary, and we were able to find only one case that holds otherwise. See Berkowski v. Hall, 91 Mich.App. 1, 282 N.W.2d 813 (1979).
[5] The District asserts that the fee is waived for anyone who is ultimately unable to pay. The applicable regulations, however, mention only collection and not waiver. See 29 DCMR § 525.12 (1987). If there is a waiver policy, it appears to be informal.
[6] The city of San Antonio charges a fee for its ambulance service. See Memo Re Revenue Act Amendments, supra, Attachment D-5 (listing San Antonio as charging $30 per trip).
[7] See note 1, supra.
[8] Appellant argues that if the rule of Warren, Platt, and Morgan is dispositive, then we should go on to consider whether the rule ought to be abolished as outmoded and artificial. This we cannot do, for we are bound by those precedents unless and until they are overturned by the court en banc. See M.A.P. v. Ryan, 285 A.2d 310, 312 (D.C.1971). We note, incidentally, that both Warren and Morgan were en banc decisions.