Phyllis WOODS, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 11–CV–1011.

District of Columbia Court of Appeals.

Argued Oct. 12, 2012.
Decided March 28, 2013.

Jeffrey L. Light, with whom Daniel E. Schultz, Washington, was on the brief, for appellant.

Holly M. Johnson, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee.

Before OBERLY and MCLEESE, Associate Judges, and STEADMAN, Senior Judge.

McLEESE, Associate Judge:

Phyllis Woods sued the District of Columbia, claiming that her medical condition was aggravated because she relied on a negligent diagnosis by a District ambulance crew that provided her with emergency care. The trial court granted the District's motion to dismiss Ms. Woods's suit on the ground that, even if the District's actions were negligent, the District was shielded from liability by the public-duty doctrine, which precludes holding the District liable in negligence based on a duty to the general public, rather than on a duty arising out of a special relationship with the plaintiff. *See generally, e.g., Wanzer v. District of Columbia,* 580 A.2d 127, 131–32 (D.C.1990). We affirm.

## I.

For current purposes, the parties do not dispute the following facts. While visiting a friend, Ms. Woods became ill, with symptoms including slurred speech, loss of balance, and vomiting. In response to a 911 call, a District ambulance crew arrived at the friend's home to evaluate Ms. Woods. After examining Ms. Woods both inside the residence and outside in the ambulance, the ambulance personnel concluded that Ms. Woods had become ill because she had recently stopped smoking cigarettes. The District personnel advised Ms. Woods of their diagnosis and told her that it was not necessary to transport her to a hospital emergency room for further evaluation or treatment. After the ambulance crew departed, Ms. Woods remained at her friend's house overnight without seeking additional care. The next morning Ms. Woods became ill once again, and was transported to the hospital, where it was determined that Ms. Woods had suffered a "completed stroke" that morning.

Ms. Woods sued the District, alleging that her medical condition had been worsened by her reliance on an incorrect diagnosis provided to her by District personnel. Relying on the public-duty doctrine, the trial court granted the District's motion to dismiss Ms. Woods's suit.

## II.

To survive a motion to dismiss, a complaint must set forth sufficient facts to establish the elements of a legally cogniza-

ble claim. *Chamberlain v. American Honda Fin. Corp.*, 931 A.2d 1018, 1023 (D.C.2007). This court reviews de novo an order granting a motion to dismiss. *Id.* at 1022. The court "accept[s] the allegations in the complaint as true and view[s] all facts and draw[s] all reasonable inferences in favor of the plaintiff[ ]." *Hillbroom v. PricewaterhouseCoopers LLP*, 17 A.3d 566, 572 (D.C.2011).

■■■ In general, "[t]he elements of a cause of action for negligence are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *Taylor v. District of Columbia*, 776 A.2d 1208, 1214 (D.C.2001) (internal quotation marks omitted). "With respect to the duty of care owed by the District in a case like the one before us, ... a government and its agents owe no general duty to provide public services to particular citizens as individuals." *Id.* (internal quotation marks omitted). "[A]bsent a special relationship between the [District] and an individual, no specific legal duty exists," and a suit against the District based on a claim of simple negligence will "fail[ ] as a matter of law." *Warren v. District of Columbia*, 444 A.2d 1, 3, 4 (D.C.1981) (en banc). Ac-

cord, *e.g.*, *Klahr v. District of Columbia*, 576 A.2d 718, 719 (D.C.1990) ("Under the public duty doctrine, a person seeking to hold the District of Columbia liable for negligence must allege and prove that the District owed a special duty to the injured party, greater than or different from any duty which it owed to the general public.").[1]

■■■ Although the District generally cannot be held liable in negligence for its failure to provide services to the general public, liability can arise if there is a "special relationship" between the District and the plaintiff. *Warren*, 444 A.2d at 4. This court has used somewhat varying formulations to describe the circumstances in which such a special relationship will arise. In *Morgan v. District of Columbia*, 468 A.2d 1306, 1314 (D.C.1983) (en banc), for example, the court explained that a special relationship will arise if there is "(1) a specific undertaking to protect a particular individual, and (2) justifiable reliance by the plaintiff." In *Snowder v. District of Columbia*, 949 A.2d 590, 604 (D.C.2008), the court described the first component of the special-relationship test in terms of a "direct contact or continuing contact between the victim and the governmental agency."[2]

---

1. This court has explained the policy considerations that underlie the public-duty doctrine, including the need to avoid "judicial scrutiny of every act of the other branches of government which has some effect upon the public," the concern about "a potential drain on the public coffers," the desire to avoid interference with municipal efforts to correct errors, the fear that government employees would be subject to unreasonable litigation risks, and the need for government officials to have broad discretion in making decisions about allocation of limited resources. *Powell v. District of Columbia*, 602 A.2d 1123, 1128 n. 5 (D.C.1992) (internal quotation marks omitted). *See also id.* ("without such a limitation on liability, the District would be potentially liable for every oversight, omission, or

blunder made by a police, ambulance or building inspection official") (internal quotation marks omitted).

2. Because we resolve this case by focusing on the second component of the special-relationship test, we need not attempt to explore the potential significance of the different formulations this court has used to define the first part of that test. A special relationship can also be created by a statute that requires the District to undertake "mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole." *Morgan*, 468 A.2d at 1314 (internal quotation marks omitted). Ms. Woods does not contend that such a statute exists in the present case. *See generally Hines v. District of Columbia*,

■ This court has indicated that justifiable reliance may be shown by establishing that "affirmative acts" by District employees "actually and directly worsen[ed] the [plaintiff's] condition." *Johnson v. District of Columbia,* 580 A.2d 140, 142–43 (D.C.1990). *See also id.* at 143 ("a victim may arguably 'rely' on an emergency crew not to worsen her condition"). As the court has cautioned, however, "that is not to say that even acts worsening the victim's condition are always sufficient to form a basis for liability." *Id.* at 143 n. 4. In general, "[t]his court has adhered to a strict interpretation of the special relationship test, including the justifiable reliance prong." *Taylor,* 776 A.2d at 1218. *See also Powell v. District of Columbia,* 602 A.2d 1123, 1128 (D.C.1992) (court "has defined [the public-duty doctrine] broadly for purposes of limiting the District's liability").[3]

### III.

Ms. Woods's principal contention is that District employees created a special relationship with her by undertaking to examine her and by providing her a mistaken medical diagnosis, upon which she relied to her detriment. We hold to the contrary.

We acknowledge at the outset that there is language in this court's decisions that, considered in isolation, provides support for Ms. Woods's contention. For example, the interaction between Ms. Woods and the ambulance personnel who examined her can reasonably be described as a "direct contact." *Snowder,* 949 A.2d at 604. Accepting the allegations in the amended complaint as true, moreover, Ms. Woods's physical condition was worsened because she justifiably relied upon the ambulance personnel's affirmative conduct in negligently misdiagnosing her condition. Conversely, however, there is also broad language in our prior opinions that, considered in similar isolation, could be viewed as foreclosing Ms. Woods's contention. *See, e.g., Allison Gas Turbine Div. of Gen. Motors Corp. v. District of Columbia,* 642 A.2d 841, 845 (D.C.1994) ("actions that are a necessary part of the on-scene responsibility of government agents subject to the public duty doctrine add nothing to the general duty owed the public and fail to create a relationship which imposes a special legal duty") (internal quotation marks and brackets omitted); *Wanzer,* 580 A.2d at 132 ("To give rise to a special relationship, the agency's response to the private party must in some demonstrable way exceed the response generally made to other members of the public.").[4]

---

580 A.2d 133, 138 (D.C.1990) (rejecting such claim as to class of persons who receive "emergency medical care" from District's Emergency Ambulance Division).

**3.** Some members of this court have criticized the court's prior decisions applying the public-duty doctrine. *See, e.g., Miller v. District of Columbia,* 841 A.2d 1244, 1248–49 (D.C. 2004) (Schwelb, J., concurring) (expressing view that court has applied public-duty doctrine "too expansively and too rigidly"). As a division, we must of course take the court's cases as we find them. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971) ("no division of this court will overrule a prior decision of this court") (footnote omitted).

**4.** The District's pre-hospital treatment protocols for its fire and emergency-medical-services departments contemplate that ambulance personnel responding to a 911 call will undertake an examination and on-the-scene assessment of the type that occurred in the present case. *See generally* District of Columbia, *District of Columbia Fire and EMS Department Emergency Medical Services Manual and Pre-hospital Treatment Protocols,* Version 1.1 (2012), *available at* http://fems.dc.gov/DC/FEMS/About+FEMS/Publications/EMS+Protocols.

■ In deciding the question before us, we must consider more than just isolated phrases in our prior decisions. *Cf., e.g., Arkansas Game & Fish Comm'n v. United States,* — U.S. ——, 133 S.Ct. 511, 520, 184 L.Ed.2d 417 (2012) ("[T]he first rule of case law as well as statutory interpretation is: Read on."); *Kraft v. Kraft,* 155 A.2d 910, 913 (D.C.1959) ("It is well to remember that significance is given to broad and general statements of law only by comparing the facts from which they arise with those facts to which they supposedly apply."). We therefore turn to a more concrete analysis of this court's prior decisions, focusing not only on the court's holdings but also on the court's "explications of the governing rules of law." *Seminole Tribe v. Florida,* 517 U.S. 44, 67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (internal quotation marks omitted). We conclude that this court's prior cases foreclose Ms. Woods's claim that her reliance on an alleged misdiagnosis by District personnel gave rise to a special relationship permitting liability in negligence notwithstanding the public-duty doctrine.

■ This court has on two prior occasions considered claims that the District could be held liable in negligence because the plaintiff relied to his or her detriment upon actions or representations by District employees providing emergency assistance. *See Miller v. District of Columbia,* 841 A.2d 1244, 1245–48 (D.C.2004); *Warren,* 444 A.2d at 1–4.[5] In each case, this court found the claim to be foreclosed.

Finding no meaningful distinction between those cases and this one, we reach the same conclusion here.

First, in *Warren,* the plaintiffs alleged that, after receiving a mistaken assurance from a police dispatcher that help was on the way, they called out to check on a roommate who was being assaulted during a burglary at their house. 444 A.2d at 2. The plaintiffs' cries alerted the burglars to the plaintiffs' presence, and the plaintiffs were kidnapped and severely abused. *Id.* Although the plaintiffs alleged that they had relied on the police dispatcher's false assurance, this court held that the public-duty doctrine barred a negligence action, because no special relationship had been established. *Id.* at 4. As this court later explained it, *Warren* concluded that the actions of the police during the rescue operation were protected by the public-duty doctrine even if the plaintiffs had "relied to their detriment" on a "false assurance that help had been provided." *Miller,* 841 A.2d at 1248.

Second, in *Miller,* the plaintiff claimed that a District police officer who had responded to the scene of a burning home had negligently misrepresented that the plaintiff's children had been removed from the home, causing the plaintiff to abandon efforts to rescue the children, who ultimately died in the fire. *Id.* at 1244–45. Relying heavily on *Warren,* this court held that the plaintiff's suit was barred by the public-duty doctrine even if the plaintiff

5. The public-duty doctrine applies to the provision of on-scene emergency medical services just as it does to the provision of police and fire protection. *See, e.g., Wanzer,* 580 A.2d at 131 ("the District's public ambulance service is equivalent to its police and fire protection, so that the special duty analysis set forth in such cases as *Morgan* (police), *Platt* (fire), and *Warren* (police) must be applied to [cases involving the operation of the District's Emergency Medical Services] as

well"); *Hines,* 580 A.2d at 137 ("the public duty doctrine insulates the [Emergency Ambulance Division ("EAD")] in essentially the same manner as the police or fire departments"); *Johnson,* 580 A.2d at 141 ("The public duty doctrine applies to conduct of the District's [EAD] in the same way that it applies to conduct of the police and fire departments, notwithstanding the fact that the District may charge a user fee for ambulance service.").

had relied on "a negligent misrepresentation of fact" made by a District employee engaged in on-the-scene rescue efforts. *Id.* at 1248.[6] We specifically rejected the contention that the District could be held liable because its employee's false statement had made the children's situation worse than it would have been but for the statement. *Id.* at 1247–48.

In both *Warren* and *Miller*, this court held that the public-duty doctrine barred a claim that a plaintiff's situation was made worse because the plaintiff relied upon actions taken by District emergency personnel in providing the kind of on-the-scene emergency assistance that the District normally provides to the general public. Ms. Woods's claim takes the same form, and we therefore conclude that it is barred by the public-duty doctrine as this court has construed that doctrine. Although Ms. Woods makes three arguments to the contrary, we do not find those arguments persuasive.

First, Ms. Woods contends that application of the public-duty doctrine to bar her claim would "run counter to the well-established case law in this jurisdiction abrogating the doctrine of governmental immunity for nondiscretionary activities." This contention does not have merit. The distinction between discretionary and ministerial functions can be relevant in determining whether the District has sovereign immunity from suit, but the court "[has] not applied [that distinction] to the public duty doctrine." *Hines,* 580 A.2d at 137. *See also, e.g., Powell,* 602 A.2d at 1126 ("This court has adopted the public duty doctrine to limit the District's liability in negligence cases where sovereign immunity is not a bar to suit.").

Second, Ms. Woods contends that this court should hold that the District's ambulance personnel had a special duty, not owed to the general public, not to negligently misdiagnose her condition. This court's decision in *Johnson,* 580 A.2d at 141–44, forecloses Ms. Woods's contention. In *Johnson,* the facts as alleged by the complaint were as follows: The decedent's family members called 911 seeking medical assistance for the decedent. *Id.* at 141. A dispatcher indicated that an ambulance would be sent. *Id.* When no ambulance arrived after ten to fifteen minutes, family members called again and were told that an ambulance was on its way. *Id.* Approximately thirty minutes after the first call, and not until after a third call was made, an ambulance arrived. *Id.* Ambulance personnel made efforts on the scene to revive the decedent, and the decedent was subsequently taken to the hospital, where she died. *Id.* The personal representative

---

**6.** Our decision in *Miller* also relied on our prior decision in *Allison Gas,* 642 A.2d at 841–45. In that case, District Harbor Patrol officers prevented private citizens from assisting in the rescue of helicopter-crash victims who ultimately drowned despite the Harbor Patrol's efforts. *Id.* at 842. Framing the issue as whether the District's rejection of the civilians' offers to assist "was an integral part of the general duty to the public or whether that act created a special relationship giving rise to a special duty" to the victims, this court found that no special relationship had been created, because the Harbor Patrol's conduct was "directly related to the officers' 'on-scene responsibility' in conducting the rescue operation." *Id.* at 844–45. We explained that "allegations of negligent acts that derive solely from the Harbor Patrol's status as [District] employees and from [the] contention that the Harbor Patrol failed to do what reasonably prudent [District] employees would have done in similar circumstances do not establish a special duty." *Id.* at 845 (internal quotation marks omitted). As we later explained in *Miller, Allison Gas* reflected a determination that liability in negligence was unavailable even though the victims' situation allegedly had been made worse as a result of a "judgment call" or "discretionary assessment of the rescue scene" made by District employees. 841 A.2d at 1247–48.

of the decedent's estate filed suit, alleging that the District had been negligent in several respects, including by giving false assurances that an ambulance would be sent, by failing to promptly provide emergency assistance, and by providing inadequate emergency assistance to the decedent at the scene. *Id.* at 141–42.

This court held in *Johnson* that the plaintiff's claims were precluded by the public-duty doctrine, except to the extent that "affirmative acts of the firefighters" "actually and directly worsen[ed] the victim's condition." 580 A.2d at 142. The court specifically held that, subject to the preceding exception, the public-duty doctrine barred the plaintiff's assertion that the firefighters "failed to properly assess [the victim's] condition, failed to provide proper cardiopulmonary resuscitation, [and] failed to properly manage [the victim's] airway or otherwise comply with reasonable standards of emergency medical care." *Id.* at 143 (internal quotation marks omitted). *Johnson* precludes the theory that a special relationship arises whenever District emergency personnel misdiagnose, i.e., "fail[ ] to properly assess," the condition of someone to whom they are providing emergency medical services.[7]

Finally, relying on *Johnson*, Ms. Woods contends that the District is not protected by the public-duty doctrine because the conduct of District employees affirmatively worsened Ms. Woods's condition. In support of that assertion, Ms. Woods contends solely that she relied to her detriment on the diagnosis provided to her by the ambulance personnel. We have already largely addressed this contention. As we have explained, our prior cases establish that detrimental reliance on a negligent "judgment call," "discretionary determination," or "incorrect statement of fact" by a District employee providing on-the-scene emergency services does not constitute the kind of "actual[ ] and direct[ ] worsen[ing]" of the plaintiff's condition that will permit imposition of negligence liability despite the public-duty doctrine. *Miller,* 841 A.2d at 1247–48; *Johnson,* 580 A.2d at 142.

This conclusion is fully consistent with *Johnson.* The victim in *Johnson* appears to have been unconscious when emergency personnel arrived, and there is no suggestion in the court's opinion that an issue of detrimental reliance had been raised at any point. 580 A.2d at 141. The theory of liability propounded by Ms. Woods in this case, however, rests on a claim that Ms. Woods suffered injury because she relied to her detriment on the response of District employees who were providing her the same type of emergency services they would provide to any member of the gen-

---

7. To similar effect is this court's decision in *Wanzer,* 580 A.2d at 128–29. In *Wanzer,* when the decedent called 911 to seek help for a severe headache, the dispatcher did not send an ambulance, instead advising the decedent to take an aspirin. *Id.* at 128. Presumably following the dispatcher's advice, the decedent apparently did not seek further assistance until a neighbor called 911 about nine hours later. *Id.* An ambulance was dispatched, and the decedent was taken to the hospital. *Id.* at 128–29. Doctors concluded that the decedent had suffered a stroke, and the decedent died two days later. *Id.* This court held that the ensuing negligence action was barred by the public-duty doctrine. *Id.* at 129–33. The court reasoned that "[a] one-time call to 911 for help does not establish a special relationship," because neither the request for assistance nor the assistance the decedent would have received—the dispatch of an ambulance—differed from the help generally sought and obtained by the public at large. *Id.* at 132. *Wanzer* contradicts Ms. Woods's contention that the mere fact of misdiagnosis by a District employee gives rise to a special relationship permitting a negligence claim to go forward despite the public-duty doctrine.

eral public. Our cases foreclose that theory of liability.[8]

## IV.

Because the facts alleged by Ms. Woods do not suffice to establish that District employees created a special relationship with Ms. Woods permitting imposition of negligence liability, the trial court correctly dismissed Ms. Woods's suit. The judgment of the trial court is therefore

*Affirmed.*

Opinion by Associate Judge OBERLY, concurring in the judgment, at page 18.

OBERLY, Associate Judge, concurring in the judgment.

I write separately to urge our court, sitting *en banc*, to reexamine the scope of the public duty doctrine or perhaps even to abolish it. Accepting, as we must, that our prior case law is binding on the division, *see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971), I acknowledge that the majority's thorough analysis of our cases supports the result reached. While I thus do not dissent from the judgment in this case, I cannot help but conclude that the result the majority reaches—denying Ms. Woods the opportunity even to seek discovery on a claim alleging serious and seemingly inexplicable negligence on the part of District emergency medical technicians ("EMTs")—suggests that we have let the doctrine sweep far more broadly than is necessary to strike the proper balance between protecting the District from sweeping liability, on the one hand, and allowing the District's citizens the chance to prove that their government has failed them miserably, on the other. Others on our court have expressed this view previously, and I align myself with their concerns. *See, e.g., Miller v. District of Columbia*, 841 A.2d 1244, 1249 (D.C.2004) (Schwelb, J., concurring in the judgment) ("when the District of Columbia—today's analogue of those who sat on the throne—wrongs one or more individuals, it should not too readily be permitted to escape liability for the harm that it has caused"); *Powell v. District of Columbia*, 602 A.2d 1123, 1134 (D.C.1992) (Schwelb, J., concurring in the judgment) ("If the District fails to [avoid injury to a foreseeable plaintiff], and if the proximate result of its failure is injury to the plaintiff, then the District should presumptively be required to compensate her for those injuries."); *Warren v. District of Columbia*, 444 A.2d 1, 12 (D.C.1981) (en banc) (Kelly, J., joined by Mack, J.) ("Once the police embarked upon services under circumstances where it was reasonably foreseeable that a citizen might rely on their performance, they assumed a duty to perform with due care."); *see also id.* at 12 (Newman, C.J., concurring in part and dissenting in part).

## I.

On December 13, 2009, at approximately 7:30 p.m., a friend of Ms. Woods called 9-1-1 on her behalf because she was experi-

---

8. Other jurisdictions take varying approaches to the scope of the public-duty doctrine and issues of governmental liability for tort claims arising out of the provision of emergency services. *See generally* John H. Derrick, *Modern Status of Rule Excusing Governmental Unit from Tort Liability on Theory That Only General, Not Particular, Duty Was Owed under Circumstances*, 38 A.L.R.4th 1194 (1985 & 2012 Supp.). We note, however, that our holding in this case is consistent with the approach taken by a number of jurisdictions that, by statute, generally preclude governmental liability for simple-negligence claims based on the provision of emergency medical services. *See, e.g.,* OHIO REV.CODE ANN. § 4765.49(A)-(B) (West 2012); 210 ILL. COMP. STAT. ANN. 50/3.150 (a) (West 2012); LA.REV.STAT. ANN. § 40:1231.2 (2013); R.I. GEN LAWS § 23–4.1–12(a)–(b) (2007); WASH. REV.CODE § 18.71.210 (2012).

encing "slurred speech, loss of balance, and vomiting." Accepting the facts as Ms. Woods pleaded them,[1] the 9–1–1 dispatcher sent an ambulance to the home of Ms. Woods' friend. The responding EMTs first examined Ms. Woods inside her friend's home and then carried her to the ambulance waiting outside to complete their examination and evaluation. Unfortunately, the EMTs misdiagnosed Ms. Woods' condition as nothing more than withdrawal symptoms from her recent cessation of smoking cigarettes, when it actually was the beginning of an "evolving embolic event." The EMTs told Ms. Woods that she was not suffering from any serious medical illness and that she did not need to be transported to a hospital for further evaluation or treatment. The EMTs then left and Ms. Woods, relying on their diagnosis and advice, returned to her friend's home and did not seek further care that evening. The next morning, however, Ms. Woods was again acutely ill and was transported to the emergency room, admitted to the hospital, and found to have suffered a completed stroke, a medical emergency she alleges would not have occurred but for the misdiagnosis. The trial court dismissed Ms. Woods' complaint for damages in reliance on the public duty doctrine, a result the majority affirms based on its careful synthesis of our prior case law. The upshot is an undeniably harsh ruling that Ms. Woods is not entitled even to seek discovery on her claim for lasting medical, financial, and emotional costs incurred as a result of the alleged negligence of District employees.

## II.

Under the public duty doctrine, the "District has no duty to provide public services to any particular citizen" unless there is a "special relationship" between the emergency personnel—police officers, firefighters, and EMTs—and an individual. *Allison Gas Turbine Div. of Gen. Motors Corp. v. District of Columbia,* 642 A.2d 841, 843 (D.C.1994) (citations and internal quotation marks omitted). Sitting *en banc,* this court held that the "general duty owed to the public may become a specific duty owed to an individual if the [emergency personnel] and the individual are in a special relationship different from that existing between [emergency personnel] and citizens generally." *Warren,* 444 A.2d at 5 (adopting appended trial court opinion). That determination is made by applying the now-familiar two-part test, which holds that a special relationship is formed where there is (1) "direct contact or some other form of privity between the victim and the [emergency personnel] so that the victim becomes a reasonably foreseeable plaintiff" and (2) "specific assurances of [emergency] services that create justifiable reliance by the victim." *Id.* at 11 (Kelly, J., concurring in part and dissenting in part); *see also Powell,* 602 A.2d at 1130.[2]

Like the majority, *ante* at 553–54 n. 2, I find it unnecessary to choose between the different formulations this court has used to explain the first part of the two-part test. Indeed, it may fairly be said that Ms. Woods meets both the "direct contact"

1. As the majority recognizes, we "accept[ ] the allegations in the complaint as true and view[ ] all facts and draw[ ] all reasonable inferences in favor of the plaintiff[ ]." *Ante* at 553, quoting *Hillbroom v. Pricewaterhouse-Coopers LLP,* 17 A.3d 566, 572 (D.C.2011).

2. While not relevant to the case before us, our court has held that "[a] 'special relationship' can [also] be established by a statute prescribing mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole." *Powell,* 602 A.2d at 1129 (internal quotation marks omitted).

formulation described in *Warren,* 444 A.2d at 11, and the "specific undertaking" for the protection of a particular individual described in *Morgan v. District of Columbia,* 468 A.2d 1306, 1314 (D.C.1983) (en banc). In any event, I conclude that Ms. Woods' suit cannot be dismissed for failure to satisfy the first factor, nor does the majority suggest otherwise.

I thus turn to the second factor, "justifiable reliance." The majority holds that Ms. Woods was not justified in relying on the EMTs' negligent diagnosis and recommended course of action, regardless of whether doing so worsened her condition, simply because the EMTs were providing her the same type of emergency services they would provide to any member of the general public. *Ante* at 557–58. "Heaven help us," one might say. Publicly funded emergency services exist to serve, assist, and protect citizens, the very people paying taxes to make them available. It is

quite difficult to understand why an individual citizen, after being examined, has no right to rely on the attending EMTs to accurately diagnose his or her medical condition or rely on their recommendation as to whether or not further medical assistance is needed, only because they provide the same service to the rest of the citizenry. With the holding the majority reaches today, it is clear that the pendulum has swung too far in favor of the District, leaving its citizens at its mercy to provide competent emergency services, without redress when those services are the proximate cause of a tragic result.[3] Surely no one would contend that Ms. Woods would be barred from bringing suit against a private physician who examined her at her friend's home and then provided the same negligent diagnosis and advice to refrain from seeking further treatment. Such a claim would be governed by garden-variety principles of tort law, and it is not at all

---

**3.** The harsh results and difficulty in applying the public duty doctrine in a consistent manner have led numerous jurisdictions to refuse to adopt or wholly abolish the doctrine. *See, e.g., Ficek v. Morken,* 685 N.W.2d 98, 104 (N.D.2004) (noting that the "major criticism leveled at the public duty rule is its harsh effect on plaintiffs who would be entitled to recover for their injuries but for the public status of the tortfeasor" and refusing to adopt the doctrine) (internal quotation marks omitted); *Beaudrie v. Henderson,* 465 Mich. 124, 631 N.W.2d 308, 313–14 (2001) (declining to expand the public duty doctrine beyond cases involving alleged "failure to provide police protection from the criminal acts of a third party" because the "fact that a public employee owes general duties to the public at large does not logically preclude the imposition of a private, individual duty. These duties are not mutually exclusive. Consequently, any attempt to draw a distinction between a government employee's 'public duty' and 'private duty' has proven to be confusing and prone to arbitrary and inconsistent application."); *Jean W. v. Commonwealth,* 414 Mass. 496, 610 N.E.2d 305, 313 (1993) ("Judges and commentators criticizing the rule have fo-

cused on the unfairness inherent in a rule that results in a duty to none when there is a duty to all, and pointed out the tortured analyses that result when courts seek to avoid such harsh results without squarely facing the underlying problem.... [Therefore] we announce our intention to abolish the public duty rule."); *Hudson v. Town of East Montpelier,* 161 Vt. 168, 638 A.2d 561, 566 (1993) (declining to adopt the public duty doctrine and noting that many "[c]ourts have rejected or abolished the doctrine because it is confusing and leads to inequitable, unpredictable, and irreconcilable results"); *Leake v. Cain,* 720 P.2d 152, 160 (Colo.1986) (en banc) ("In our view, the problems associated with the public duty rule far outweigh the benefits of the rule, which are more properly realized by other means."); *Adams v. State,* 555 P.2d 235, 241–42 (Alaska 1976) ("[W]e consider that the 'duty to all, duty to no-one' doctrine is in reality a form of sovereign immunity, which is a matter dealt with by statute in Alaska, and not to be amplified by court-created doctrine.... Why should the establishment of duty become more difficult when the state is the defendant?").

clear to me why Ms. Woods' claim against the District should not be resolved in the same manner. As the majority explains, however, our cases "preclude[ ] the theory that a special relationship arises whenever District emergency personnel misdiagnose, i.e., 'fail[ ] to properly assess,' the condition of someone to whom they are providing emergency medical services." *Ante* at 557 (quoting *Johnson v. District of Columbia,* 580 A.2d 140, 143 (D.C.1990)). Is that really the result we must embrace for our citizenry? I think not.

### III.

In *Powell,* 602 A.2d at 1128 n. 5, the court catalogued the public policy considerations that underlie the public duty doctrine. In my view, they are overstated and do not justify continued adherence to the doctrine in its present form. First, the court observed that the doctrine "is necessary to avoid judicial scrutiny of *every act* of the other branches of government which has some effect upon the public." *Id.* (emphasis added) (internal quotation marks omitted). But there is no reason to suppose such a broad incursion into the functions of the legislative and executive branches of government would result if the doctrine were abolished or scaled back. More realistically, the result would be nothing more than a grant to citizens of the right to seek redress when District personnel have negligently assisted a particular individual in need of emergency services. The citizen might not "win" because she still must prove the basic elements of a cause of action sounding in tort. As the Supreme Court of Colorado stated:

> The fear of excessive governmental liability is largely baseless in view of the fact that a plaintiff seeking damages for tortious conduct against a public entity must establish the existence of a duty using conventional tort principles, such

as foreseeability, in the same manner as if the defendant were a private entity.... Another hurdle the plaintiff must surmount in order to recover is proof of proximate cause. The traditional burdens of proof tied to tort law adequately limit governmental liability without resort to the artificial distinctions engendered by the public duty rule.

*Leake,* 720 P.2d at 160; *see also Hudson,* 638 A.2d at 566 (noting that "concerns over excessive government or public employee liability are baseless considering the limitations on liability afforded by conventional tort principles, various types of official immunity, or exceptions to waivers of sovereign immunity").

The *Powell* court also noted worries about "fiscal concerns" and "a potential drain on the public coffers." 602 A.2d at 1128 n.5. But these concerns are both misguided and overstated. *See, e.g.,Leake,* 720 P.2d at 159 (rejecting the argument that the "financial impact on government and interference with governmental operations" are an appropriate "policy basis for the public duty rule"); *Ryan v. State,* 134 Ariz. 308, 656 P.2d 597, 598 (1982) (en banc) (abolishing the public duty doctrine and responding to critics: "We are also told that not only will the public treasury suffer but government will come to a standstill because its agents will be afraid to act. We can't but recall the dire predictions attendant to the [abolishment of sovereign immunity]. Arizona survived!"), *modified by statute,* Actions Against Public Entities or Public Employees Act, A.R.S. § 12–820 *et seq.* (1984); *Riss v. City of New York,* 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860, 863 (1968) (Keating, J., dissenting) ("The fear of financial disaster is a myth. The same argument was made a generation ago in opposition to proposals that the State waive its defense of 'sovereign immunity'. The prophecy

proved false then, and it would now. The supposed astronomical financial burden does not and would not exist.").[4]

Nor would abolition or refinement of the public duty doctrine usurp the ability of public employees to exercise "broad discretion in responding to demands given limited resources and 'the inescapable choices of allocation that must be made.' " *Powell,* 602 A.2d at 1128 n. 5 (internal quotation marks omitted). Sovereign immunity would continue to protect the District and its employees in such situations. *See, e.g., Tucci v. District of Columbia,* 956 A.2d 684, 697–98 (D.C.2008) (holding that sovereign immunity shields the District from liability in a suit alleging failure adequately to enforce municipal regulations governing litter, causing plaintiffs' property to be infested by rats and vermin).

In sum, I reiterate that it is time to reevaluate the scope of the public duty doctrine and even its continuing justification. Interpreting the doctrine so that it shields the District from liability where it is alleged that its EMTs negligently misdiagnose a citizen, causing her to suffer a stroke that might have otherwise been avoided, is unjust. Surely we can strike a *more appropriate* balance between the citizenry's interest in seeking redress when competent emergency services are not provided, and the government's interest in protecting the ability of emergency workers to respond to a crisis without worrying that their actions might later be "dissected at trial and subject to an expert's opinions as to whether, in hindsight, [they] acted as [ ] reasonably prudent" emergency responders. *Allison Gas,* 642 A.2d at 845 (internal quotation marks omitted). I

therefore urge the *en banc* court to grant review in this case.

leaving [appellant] uncompensated for the harm which, if the allegations of her complaint are true, the District's negligence has surely caused her.").

---

**4.** *See also Powell,* 602 A.2d at 1136 (Schwelb, J., concurring in the judgment) ("To the extent that the public fisc is diminished by holding the District liable in such a case as this, that consequence is not nearly as unjust as