NEBEKER, Senior Judge:
In this matter, appellants, Sherry Allen and Wayne Allen, filed a wrongful death and survival action against the District of Columbia, after their son Eric Allen (“Allen,”) aka Eric Roberson, a prospective firefighter, participated in a required Physical Ability Test (“PAT”), became ill, and died. Appellants allege “gross negligence of the EMT [emergency medical technician] in charge of evaluating the firefighter candidates at the PAT.” The issues we address on appeal are (1) whether the public duty doctrine applies and bars the action or, instead, (2) whether the action may proceed, either because the doctrine is not implicated on the facts of this case, or because an exception to the doctrine applies, on the ground that the District owed a special duty to Allen. The trial court granted summary judgment in favor of the District, applying the public duty doctrine and holding that the District owed no special duty to Allen. We affirm.[1]
I.
The record reveals that in March of 2006, Eric Allen began the lengthy process of qualifying to be a firefighter with the District of Columbia Fire and Emergency Medical Services Department (FEMS).[2] On October 14, 2007, the District invited Allen and approximately two dozen others to participate in its Physical Ability Test (PAT) in order to determine if he was physically qualified to be a firefighter.[3] Prior to beginning the test, FEMS Captain Sylvester Robinson directed the candidates to have their vital signs (blood pressure, pulse rate, and oxygen saturation) taken by the on-scene paramedic, and all were permitted to participate in the PAT thereafter. Paramedic EMT Lee Mason and EMT Veronica Johnson (aka Veronica Baskerville), who were staffing a unit known as “Medic 33” and who had been *66 “assigned to the [DC Fire/EMS] training academy” as the “stand-by unit” “for the purpose of the test[,]” had set up a station for vital-sign screening (Robinson referred to it as a “first aid station”) in Room 2 at the test site. After the candidates’ vital signs had been taken, several FEMS monitors escorted the prospective firefighters through each of the components of the PAT. The candidates, monitors, and escorts were told that if they experienced any problems on the course at any point, they should ask for Captain Robinson, who was the classroom facilitator for the PAT, or for Battalion Fire Chief Milton Douglas, who would “respond to their location.” The FEMS Physical Ability Test Administration Guide instructed monitors that they must “watch candidates for signs that they are in physical distress” and that “[i]f these signs are seen, it is important that the candidate be stopped and monitored by the on-scene paramedic.”
Upon completion of the PAT, Allen became ill and complained of “pain in his entire body.” Allen informed Battalion Fire Chief Douglas that he did not have any long-term medical problems. Douglas notified Captain Robinson, to “have the Medic Unit that was assigned to the training academy for the purpose of the test to report to the [PAT] apparatus floor to evaluate [Allen].” Robinson, who was at the finish line when Allen completed the course to escort him back to Room 2 to have his vital signs taken, observed that Allen “showed signs of rapid breathing that was not normal[.]” Robinson “ran” to the room where paramedic Mason and EMT Johnson were stationed and told them that a candidate was having trouble breathing and that their assistance was needed.[4] Robinson told them that “they were going to need their oxygen,” “[a]t which time they informed [him that] they had to go to [their ambulance, which was parked beside the test-site building] unit to get it.”[5] Mason and Johnson evaluated Allen, took his vital signs and performed an EKG.[6] They placed Allen on oxygen, but did not administer IV fluids. Mason told Douglas that Allen required transport to a hospital. Douglas notified Robinson to dispatch an ALS Medic Unit for patient transport. When Robinson asked Mason and Johnson “if they were going to trans-porte,]” Mason informed Douglas and Robinson that Allen’s “vital signs were normal and that a basic unit was all that was required.” Robinson therefore called for a basic life support unit, and one was dispatched, arriving in about six to ten minutes. EMT Thomas Williams, a member of the responding basic life support unit, recalled that “no engine company (first responder) was being dispatched because a paramedic [presumably, Mason] was already on the scene.” Williams asked Mason what code Allen should be, and Mason classified Allen as a “Priority 3 (stable, nonemergency),” the lowest emergency priority. EMT Williams and EMT John T. Davis, transported Allen to the Greater Southeast Community Hospital where he was immediately placed in the waiting *67 room because, at least in part, Greater Southeast Community Hospital saw no reason to change his classification to a higher priority. Allen waited approximately one hour, his condition worsened, and he was eventually flown by helicopter to Washington Hospital Center, where he died of “acute exertional rhabdomyolysis” (Rhabdo) the morning of October 15th.
Appellants brought survival and wrongful death actions sounding in negligence against the District, Greater Southeast Community Hospital, and the doctors who attended Allen at the hospital for an alleged failure to exercise reasonable care in attending to Allen. The District moved to dismiss the action. Because both parties had submitted a variety of depositions and exhibits and stated to the court that “the record [was] now complete,” the trial court, without objection, treated the motion as one for summary judgment, and found for the District by concluding there was no “special relationship” that excepted this case from the public duty doctrine and that the doctrine applied to bar the action. The other parties settled with appellants, and this appeal followed.[7] After oral argument, we stayed the appeal pending a determination as to whether this court would sit en banc to review the application of the public duty doctrine in another case. The petition for rehearing en banc in that case was denied on February 7, 2014, and we now proceed to resolve this appeal.
II.
A. Standard of Review
“Summary judgment is properly granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Turner v. District of Columbia, 532 A.2d 662, 666 (D.C.1987) (quoting Super. Ct. Civ. R. 56(c)). “On appeal this court must view the record in the light most favorable to the party opposing the motion, and must resolve any doubt as to the existence of a factual dispute against the moving party.” Taylor v. District of Columbia, 776 A.2d 1208, 1213-14 (D.C.2001). “In short, what we seek is evidence from which, were it accepted as true, a trier of fact might find for the appellant.” Truitt v. Miller, 407 A.2d 1073, 1077 (D.C.1979).
B. Public Duty Doctrine
The public duty doctrine “operates to shield the District and its employees from liability arising out of their actions in the course of providing public services.” Hines v. District of Columbia, 580 A.2d 133, 136 (D.C.1990). In essence, appellants ' claim that Allen’s circumstances made him excepted from the public duty doctrine through his establishment of a *68 special relationship (or “special duty”) with the District because, at least in part, Allen’s emergency was not a typical “911 emergency.” As such, appellants acknowledge that this court has applied the public duty doctrine in cases involving the provision of emergency services.
1. Whether the Public Duty Doctrine Applies
At the commencement of this action, the public duty doctrine was assumed to apply; thus, what was litigated in the trial court, and originally briefed here, was that the doctrine applied save for the exception.[8] On appeal, it was not until appellants’ Reply Brief that they argued that the “public duty doctrine does not apply to the situation presented here.” “Normally, we do not consider arguments raised for the first time in a reply brief.” Williams v. United States, 52 A.3d 25, 50 n. 104 (D.C.2012). However, we will make an exception when failing to do so “would permit a clear miscarriage of justice to occur.” Cannon v. District of Columbia, 569 A.2d 595, 596 (D.C.1990). For that reason, and because this court has never addressed whether the public duty doctrine is applicable with respect to conduct by EMS personnel who are assigned to provide on-site vital-signs monitoring of firefighter candidates during administration of a PAT, we requested additional briefing after oral argument on the issue of whether the public duty doctrine is implicated in the first place. Now that both parties have briefed the issue, we believe that it is appropriate for us to decide the issue.[9] After reviewing the supplemental briefs, we find that the public duty doctrine is applicable.
“Under the public duty doctrine, the District has no duty to provide public services to any particular citizen unless there is a ‘special relationship’ between the emergency personnel — police officers, firefighters, and EMTs — and an individual.” Woods v. District of Columbia, 63 A.3d 551, 559 (D.C.2013) (Oberly, J., concurring in the judgment) (quoting Allison Gas Turbine Div. of Gen. Motors Corp. v. District of Columbia, 642 A.2d 841, 843 (D.C. 1994)); Hines, supra, 580 A.2d at 136 (“[Ajbsent some ‘special relationship’ between the government and the individual, the District’s duty is to provide public services to the public at large[,]” not to any individual who emerges to seek services); id. at 139-40 (agreeing that “responses to calls for emergency assistance are simply not actionable under the public duty doctrine”); Wanzer v. District of Columbia, 580 A.2d 127, 129 & 132 (D.C. 1990) (holding, in case where claim was *69 that the decedent “would have survived his stroke if an ambulance had been sent when first summoned,” that the public duty doctrine barred a suit alleging negligent and inept failure to dispatch an ambulance); Johnson v. District of Columbia, 580 A.2d 140, 143 (D.C.1990) (reasoning that the facts pled “could not sustain liability insofar as they merely represent the failure of the firefighters to perform any particular step that might have alleviated [the decedent’s] condition”). We are satisfied that the public duty doctrine applies here because of the evolving role of the EMTs Mason and Johnson.
The record shows that, as monitors for the PAT, Mason and Johnson set up their station in a classroom some distance from the PAT apparatus floor (Robinson had to “run” there after seeing Allen in distress) for taking pre- and post-test vital signs of PAT participants. Their role was to ensure that all the candidates were physically qualified to begin the test and to take their vital signs at the end (presumably to determine whether they were in a physical condition as to have “passed” the test) and to “monitor” any candidate observed to be in distress. They brought into the classroom a “Lifepak monitor and a BP cuff and stethoscope,” the equipment needed to take vital signs. PAT monitors were instructed that if they saw signs of distress, they were to have the candidate “monitored by the on-scene paramedic.”[10]
When Captain Robinson ran to get Mason and Johnson after Allen had finished the course and had trouble breathing, he was not seeking monitoring but emergency assistance, telling the EMTs that they would need their oxygen. They had not brought into the PAT site the equipment— for example, oxygen and an ALS jump bag — they needed to act as emergency responders, but went to retrieve them from their ambulance and stepped into the role of emergency first-responders.[11] For that reason, no engine-company first responder was dispatched to the PAT site. In thereafter advising that Allen needed to be transported to the hospital but required only a basic life support unit, Mason and Johnson functioned in a manner similar to a 911 dispatcher, who must make a call as to whether an ambulance is needed, and which type is required (basic or advanced life support). Cf. Wanzer, supra, 580 A.2d 127 (affirming dismissal of suit on basis of the public duty doctrine, where facts were that the 911 caller complained of a headache and asked for ambulance to be sent, the 911 dispatcher declined to send an ambulance and advised the caller to “take an aspirin,” and the caller subsequently died of a stroke). Reviewing paramedic Mason’s performance after the fact, her superiors concluded that she failed in several ways to respond appropriately to Allen’s condition.[12] Notably, however, they *70 did not find that Mason failed to bring oxygen and advanced life support equipment into the test site when setting up for the PAT.
The foregoing facts are described in the documentary evidence and appear to be undisputed. When we consider them in the light most favorable to appellants, as we must, we see no basis for concluding that that any acts or omissions by Mason in responding to Allen’s health crisis were part of the PAT program rather than a part of the District’s provision of emergency services. Any negligence of Mason (and Johnson) in treating Allen occurred once their role evolved from basic monitors to emergency responders. And, “[b]oiled down to their essen[c]e,” appellants’ claims about Mason’s and Johnson’s negligent failure to properly evaluate Allen’s condition “amountn to the same basic allegation” that we held in Hines is barred by the public duty doctrine: allegations that “the wrong unit was dispatched”; “the call for the correct unit (advanced life support)” was not made; and the equipment dispatched was not adequate. 580 A.2d at 139. For these reasons, we conclude that the public duty doctrine is applicable. To hold otherwise would create a perverse incentive for the District to require its EMTs who are assigned to the PAT and thus are nearby to refrain from rendering emergency assistance to candidates lest the District forfeit, as to any deficiencies in their emergency responses, the shield from liability it would enjoy if it waited for emergency response units to be dispatched from elsewhere (just as when a call is made to 911 for emergency assistance).
As we have previously recognized, “[t]he District of Columbia should be free to exercise its police power for the benefit of the general public without the fear that by making contact with citizens in the course of carrying out its responsibilities, the District may forfeit its immunity under the public duty doetrine[.]” District of Columbia v. Forsman, 580 A.2d 1314, 1319 (D.C.1990).[13] In this case, unless an exception to the public duty doctrine applies, the District was free to use FEMS paramedics who were on duty at the PAT test to respond to the health emergency that arose, without the risk that by doing so it would expose itself to liability.
2. Application of the Public Duty Doctrine
In order to establish a special relationship, or “special duty,” that falls under an exception to the public duty doctrine, “a plaintiff must allege and prove two things: (1) a direct or continuing contact between the injured party and a governmental agency or official, and (2) a justifiable reliance on the part of the injured party.” Klahr v. District of Columbia, 576 A.2d 718, 720 (D.C.1990) (citing Turner, supra, 532 A.2d at 667).
*71 The Superior Court observed that the main dispute between the parties was whether Allen had a special relationship with the District. The court acknowledged some direct contacts in that Allen had communicated with FEMS throughout the application process, and some reliance on FEMS’s representations about the PAT, but nevertheless held that appellants had not established more than a duty of the FEMS to assist the general public, which was insufficient to show that the District created a special relationship with Allen. For the court, it was important that appellants had not claimed that the District specifically recruited Allen or any candidate and that any individual could apply to be a firefighter and the District would have corresponded with them to the same extent. Thus, simply “because a person ‘emerges’ from the general public to the attention of the government does not establish a special relationship.” The presence of EMS at the PAT was “no different than a city stationing an ambulance at a high school football game to assist the players if they become injured.” It was simply a gratuitous promise like the one in Morgan v. District of Columbia, 468 A.2d 1306 (D.C.1983) (en banc).
a. Direct and Continuous Contact
Here, appellants contend that the District established direct and continuous contact with appellants sufficient to establish a special relationship because it recruited and evaluated prospective firefighters. Specifically, appellants urge, much as they did in the Superior Court, that Allen (1) had direct and continuing contacts with the District because he applied to FEMS in March of 2006, approximately eighteen months before the PAT test, (2) signed a “Letter of Intent” in April of 2006 to participate in the entry-level Firefighter Written Examination, (3) completed and passed the examination the following month, (4) was provided an “Initial Notice” by the District in September of 2007, and (5) was invited to participate in the PAT test on October 14, 2007.
As noted above, as many as two dozen applicants were assembled for physical screening. All were subjected to the same scrutiny before the PAT began, and then Allen suffered pain and difficulty breathing. Medical aid was summoned, just as if he had been overcome with pain on a nearby street. It is from this that we are asked to declare an exception to the public duty doctrine by virtue of a special relationship between Allen, his nearly two dozen peers, the more than 100 prospective firefighters that participate in the PAT every year, and the medics on-scene performing the screening.
In order to establish a special relationship, appellants have the burden to show direct or continuing contact between Allen and FEMS. Klakr, supra, 676 A.2d at 720. Appellants attempt to show that Allen established a special relationship for his emergency situation by his repeated contacts with the District more than a year (and up to a year-and-a-half) earlier. As the trial court here observed, “any individual could have applied to be a firefighter and the District would have corresponded with that person to the same extent that it corresponded with Eric Allen.” See Nealon v. District of Columbia, 669 A.2d 685, 693 (D.C.1995) (“A party must show that such contact was different from the type of contact that the District has with the general public” (citing Powell v. District of Columbia, 602 A.2d 1123, 1130 (D.C. 1992))). If the District had effectively made a promise to protect Allen, that promise would have applied equally to the more than one hundred other contenders who participate in the PAT every year, and the two dozen PAT participants that day. This would require either having *72 over two dozen special relationships that day and more than one hundred over the course of the year, as to each applicant being screened (which is not practical or possible), or holding that the response to the sudden disability by the ones initially called upon created that relationship. By definition of a special relationship, that is not practicable or legally possible. Hines, supra, 580 A.2d at 136 (“Our case law makes it clear that the mere fact that an individual has emerged from the general public and become an object of the special attention of public employees does not create a relationship which imposes a special legal duty.”); cf. Varner, supra, 891 A.2d 260, 276 (D.C.2006) (police presence on campus of Gallaudet University, and promise to protect some 2,000 students could not create 2,000 special relationships without “nullifying] the [public duty] doctrine itself’).
A government functions through people, usually its citizens. Thus, the primary task for its leaders (after they are chosen) is to recruit and evaluate those potentially available to facilitate the governmental role of providing public services. An emergency resulting thereafter from the provision of emergency services is insufficient to engender a special relationship.
More specifically, appellants’ claim that Allen established direct or continuing contact with the District through his actions as a prospective employee must also fail. See Flemmings v. District of Columbia, 719 A.2d 963, 964 (D.C.1998) (rejecting, in a case involving a police officer who was shot by his girlfriend, who was also a police officer, the argument that employment by the District created a special relationship with the District). Appellants cannot, without more, show direct or continuous contact by relying on what Allen did several months, or more than a year earlier, to show that there was a special relationship. As we stated in Warner, supra:
Even a series of contacts over a period of time between a public agency and an injured or endangered person is not enough to establish a special relationship, absent some showing that the agency assumed a greater duty to that person than the duty owed to the public at large. If it were otherwise, then the city would be potentially liable for ‘every oversight, omission, or blunder’ of its officials — a liability which potentially could so deplete the resources necessary to provide police protection, fire protection, and ambulance service as to result in the elimination of those services altogether.
580 A.2d at 132 (citation omitted); accord Powell, supra, 602 A.2d at 1130-31 (“[M]ere contacts are insufficient in the absence of evidence of a special duty ... [We] require[ ] ... proof of a type of contact different from that of the District with the general public, ... [and] proof of justifiable reliance.”). Thus, appellants’ proffer of such remote contacts fails to show how EMTs responding to Allen’s emergency had somehow established a special relationship with him.
Even assuming arguendo that appellants could claim that a special relationship was established between himself and the District (specifically, FEMS recruitment personnel) while he was acting as a prospective FEMS employee, that special relationship would not also encompass the alleged EMT errors during Allen’s medical emergency. Cf. Stoddard v. District of Columbia, 623 A.2d 1152, 1153-54 (D.C. 1993) (concluding that even though some parents could prove that they justifiably relied on presence of school crossing-guards, child without parent who crossed street some two football fields from crosswalk could not claim special relationship); *73 Foreman, supra, 580 A.2d at 1318 (concluding that even if government agent’s assistance in one matter was sufficient to create special relationship in that matter, it was not sufficient to create special relationship in entirely different matter). Nor do appellants claim in their brief that the EMTs responsible for transporting Allen in the basic life-support unit were the source of a special relationship between Allen and the District.
Finally, appellants argue forcefully that Allen’s emergency was not a “911 emergency call case.” As appellants state in their brief, and as the record reflects, despite any on-scene assessment of Allen by EMTs, FEMS personnel had to radio for a basic-life support unit to transport Allen to a hospital, which did not arrive until several minutes later, much like a regular emergency situation. Despite the presence of EMTs Mason and Johnson on scene at the PAT, we are not prepared to distinguish this case from “emergency services cases” strictly because FEMS personnel radioed for a basic life support unit rather than dialing 911 for emergency services like a regular citizen. See Hines, supra, 580 A.2d at 136 (concluding “actions that are a necessary part of the on-scene responsibility of government agents subject to the public duty doctrine add[ ] nothing to the general duty owed the public and fail[] to create a relationship which imposes a special legal duty.”) (alterations in original) (internal quotation marks omitted); accord Warner, supra, 580 A.2d at 132 (“A one-time call to 911 for help does not establish a special relationship.”). In an emergency context, we explicitly deny the jury the opportunity to judge the actions of EMTs in hindsight in the absence of affirmative negligence (i.e., affirmative action that worsens the condition of the individual receiving emergency services). See Johnson, supra, 580 A.2d at 142, 143.
b. Justifiable Reliance
Even assuming arguendo that appellants did establish direct or continuing contacts (and they have not done so here), appellants fail to demonstrate justifiable reliance. See Snowder v. District of Columbia, 949 A.2d 590, 604 n. 12 (D.C.2008). On this point, the trial court concluded that appellants had not shown that Allen acted or refrained from acting in reliance on the EMTs. The court reasoned that appellants essentially claimed that the EMTs were inadequate and untimely in their response to Allen’s emergency, and this court rejected such a claim in Johnson, supra, 580 A.2d 140.
Appellants contend that the District’s requirement that firefighters pass the PAT significantly raised the “quotient of risk” above that assumed by the general public. Additionally, Allen justifiably relied on the District, appellants argue, because FEMS provided monitors for each candidate participating in the PAT, and told them to speak with FEMS personnel in charge of the PAT if they experienced problems while completing the components. From the combination of those facts, appellants contend, “it can be reasonably inferred” that Allen justifiably relied on [FEMS] and the PAT safety precautions.
To show justifiable reliance, a “plaintiff [or person allegedly in privity with the District] must specifically act, or refrain from acting, in such a way as to exhibit particular reliance upon the actions of the [EMTs].... Liability is established, therefore, if the [EMTs] [have] specifically undertaken [action on behalf of] a particular individual and the individual has specifically relied upon the undertaking.” Morgan, supra, 468 A.2d at 1315 (citations omitted); see Taylor, supra, 776 A.2d at 1218 (citing Morgan, supra). As we have stated, despite what a jury could “reason *74 ably infer” with respect to justifiable reliance, such an argument “cannot substitute for evidence of ‘justifiable reliance.’ ” Taylor, supra, 776 A.2d at 1220 (emphasis added).
Here, appellants have not shown justifiable reliance in order to establish a special relationship. Despite their conclu-sory allegations to the contrary, appellants have failed to show that Allen acted or failed to act in any way, because of the presence of EMTs, PAT monitors, or any other safety personnel at the test. Indeed, a conclusion that there was a special relationship between Allen and the District, relying overwhelmingly on the fact that EMTs were present at the PAT, would be the impetus toward perverse incentives such as the avoidance of safety precautions. Cf. Varner, supra, 891 A.2d at 272 (holding that operational manuals do not establish standard of care because, to hold otherwise, “would create the perverse incentive ... to write [manuals] in such a manner as to impose minimal duties ... in order to limit civil liability.” (internal quotation marks omitted)). Additionally, Allen’s decision to sign the liability waiver that FEMS required him to sign before he could participate in the PAT, regardless of its legal value otherwise, is indicative of Allen’s assent to the District’s claim that it could not be held liable for any injuries or death as a result of the PAT and undermines any claim that the District was on notice that Allen would rely FEMS to ensure that no harm befell him.[14] Even assuming appellants could claim justifiable reliance based on the deposition testimony (e.g., BFC Douglas’s testimony that FEMS “assume[d] the obligation to be responsible for [firefighter candidates] when they’re in the [PAT]”), without direct or continuous contact (which does not exist here), appellants’ claim of a special relationship fails, and the public duty doctrine applies. See Snowder, supra, 949 A.2d at 604 n. 12.[15]
Finally, appellants’ focus on Mason’s classification of Allen as a “priority 3,” requiring Mason to “brfing] in” a basic life support unit during the emergency rather than a better equipped vehicle, is unpersuasive. The claim, in essence, is one attacking the adequacy and timeliness of emergency services, which this court foreclosed more than two decades ago. See Hines, supra, 580 A.2d at 136, 139-40 *75 (“[C]hallenges to the adequacy and timeliness of the dispatch of emergency equipment ... are simply not actionable under the public duty doctrine.”); see also Allison Gas Turbine, supra, 642 A.2d at 843-44 (citing, inter alia, Hines, supra, for the same proposition).
Appellants would have this court look to possible negligence in the sequence of events before Allen’s death and his reliance on government actors. We cannot do so because such factors are relevant only if potential liability is, by the special relationship exception to governmental immunity, established in the instance. In light of the foregoing considerations, we conclude that the public duty doctrine protects the actions of the District and its employees in connection with the provision of emergency services here.
The grant of summary judgment in favor of the District is

Affirmed.

.This appeal was stayed on September 12, 2013, to await action on an en banc petition in Woods v. District of Columbia, 63 A.3d 551 (D.C.), reh’g denied en banc, No. ll-CV-1011 (Dec. 17, 2013), which presented, at invitation from within the court, whether the public duty doctrine should be abrogated. Interestingly, after the en banc petition was filed, the District of Columbia Council — independently of the District's Attorney General — filed an amicus response opposing en banc action to overturn that long standing doctrine. The thrust of that response by the legislative branch was budgetary instability combined with the public policy nature of the issue arguing for legislative — not judicial — judgment. One might expect that if the wish of our dissenting colleague were to materialize the two other branches would legislatively nullify our abrogation of that judge-made doctrine as the amicus response suggested.

. Less than two weeks after submitting his application, Allen also submitted a "Letter of Intent” in order to take the Paramedic/Firefighter Entry-Level examination. In May of 2006, he successfully completed the exam.

. The PAT test contains nine separate components, which an applicant is required to complete. These components include: (1) aerial ladder climb: (2) hydrant opening; (3) ladder carry; (4) ladder extension; (5) charged line advance; (6) stair climb with equipment; (7) ceiling pole; (8) victim rescue in a confined space; and (9) victim rescue dummy drag. As many as two dozen prospective firefighters may have participated in the PAT that day. Approximately 120 persons participate in the PATs on an annual basis.

.Robinson also summoned PAT candidate Justin Free, who was a "paramedic crossover,” telling him that (in the absence of Mason and Johnson) his assistance was needed in checking the vital signs of the other candidates, so that those candidates could be released. Free and Robinson "then went to Engine 3, which is a paramedic company, and got the equipment necessary to perform the post vital exam” on the other candidates.

. Mason had not brought into the test site her "ALS [Advanced Life Support] Jump Bag."

. The Complaint alleges that Allen had an "extremely elevated heart rate of 142 beats per minute, as well as rapid respirations, a low diastolic blood pressure, and other indications of severe illness.”

. After the trial court granted summary judgment for the District, appellants moved the court to reconsider its decision, or, in the alternative, to certify an interlocutory appeal to this court since the hospital defendants remained involved in the lawsuit. The trial court declined to reconsider its decision but agreed to certify to this court, pursuant to D.C.Code § 11 — 721(d) (2001), whether or not the plaintiffs’ claims against the District could be dismissed under the public duty doctrine. Only a short time later, appellants and the other defendants settled their claims. Thereafter, appellants noted an appeal of the trial court’s order with respect to summary judgment. The District moved to dismiss the appeal on account of the fact that it still had a cross-claim against the hospital defendants, and the Allens opposed the motion because no other parties remained in the action. On June 20, 2011, this court, agreeing with the Allens, concluded that the trial court’s summary judgment order was now a final and appealable order, and the interlocutory appeal was moot.

. Appellants did assert in their sur-reply in opposition to the District’s dispositive motion that "the public duty doctrine is entirely inapplicable to the case at bar.” They made the same argument in their Motion for Reconsideration of the trial court's ruling, saying that "the Public Duty Doctrine should not have been applied in this case at all." In its order denying the Motion for Reconsideration, the trial court referred to the Allens' "arguments concerning the application of the public duty doctrine generally” and said that "these arguments have been rejected.”

. See, e.g., Chesapeake & Potomac Tel. Co. v. Public Serv. Comm’n, 339 A.2d 710, 712 n. 6 (D.C.1975) ("Although neither the Commission nor the Telephone Company presented this issue on appeal, this court sua sponte requested supplemental briefs concerning the applicability of the APA to proceedings before the Commission.”); Outlaw v. United States, 632 A.2d 408, 411 n. 7 (D.C. 1993) ("A court may consider an issue antecedent to ... and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief.” (quoting United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., 508 U.S. 439, 447, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (internal quotation marks omitted))).

. Appellants make no claim that Mason and Johnson, or any other FEMS personnel at the PAT site, failed to observe the candidates for safety, to monitor whether they were in distress, or to summon help.

. This was not their usual PAT role: When Mason determined that Allen required hospital transport, Captain Robinson asked whether Mason and Johnson would transport Allen, rather than assuming that they would do so in their ambulance that was parked nearby. Mason "had worked as a paramedic at many previous PAT’s” and had never had to transport anyone. For its part, see note 3 supra, FEMS had no arrangement in place for replacement EMTs to take the candidates’ post-test vital signs if (as happened here) those assigned to the task were called away to act as emergency responders.

.They found, inter alia, that Mason
failed to recognize the severity of the patient’s condition; failed to perform a complete patient assessment; ignored or failed to recognize an abnormal EKG; ignored her duty to the patient by requesting a basic *70 life support ... unit ... to transport the patient; failed to perform standard ALS [advanced life support] assessment procedures and interventions, such as 12-lead EKG and IV fluid administration, that were clearly indicated; failed to provide a proper report to the transporting unit; [and] ordered the transporting ... unit to categorize the patient as a stable, non-emergency Priority 3 transport^]
As a result, Mason was removed from "patient contact status”, and "appropriate disciplinary action[,]” including the possibility of termination, was recommended. Cf. Morgan, supra, 468 A.2d at 1312 (although public duty doctrine barred suit, "other effective mechanisms exist to control the behavior of errant ... officials.”).

. “[0]peration of the EMS is an exercise of the District's police power to further the general health and welfare[.]” Wanzer, supra, 580 A.2d at 131.

. As the waiver explicitly states, Allen agreed to "assume any and all risk and liability for ... death which [he] might suffer or sustain while [o]n any ... property or premises owned or operated by [FEMS] or the [District].”

. Appellants also claim that the District was affirmatively negligent in providing emergency services care for Allen and that the District did not adequately screen candidates for (and exclude those with) "Sickle Cell Trait.” As the trial court observed, appellants argued in its response to the District’s motion to dismiss that it did not need to prove affirmative negligence, made no effort to prove it, and changed course in a last minute supplemental brief on appellants’ motion for reconsideration (of the Court’s summary judgment for the District), more than a month after its initial brief in its motion for reconsideration. We decline to consider appellants' argument of affirmative negligence on appeal because it is contrary to the position appellants took prior to summary judgment. See, e.g., Duk Hea Oh v. National Capital Revitalization Corp., 7 A.3d 997, 1010 (D.C.2010) ("[A] defendant may not take one position at trial and a contradictory position on appeal.”) (quoting Brown v. United States, 627 A.2d 499, 508 (D.C. 1993)). We also decline to consider appellants’ "Sickle Cell trait” argument because it was not adequately raised below. See In re D.A.J., 694 A.2d 860, 864 (D.C. 1997) ("Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party’s thesis, will normally be spurned on appeal.” (emphasis added) (internal quotation marks omitted)).