*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CV-293

NAFISA HOODBHOY, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2019 CA 007484)

(Hon. Heidi M. Pasichow, Trial Judge)

(Argued December 8, 2021                    Decided September 22, 2022)

*Patrick M. Regan*, with whom *Christopher J. Regan* and *Emily C. Lagan* were on the brief, for appellant.

*Holly M. Johnson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. Alikhan*, Solicitor General at the time of argument, *Caroline S. Van Zile*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General, were on the brief, for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and KRAVITZ, *Associate Judge*, Superior Court of the District of Columbia.[*]

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2001).

Opinion of the court by *Associate Judge* DEAHL.

Concurring opinion by *Associate Judge* EASTERLY at page 19.

DEAHL, *Associate Judge*: Hilman Jordan shot and killed Jawaid Bhutto in the parking lot of the condominium building where they both lived. At the time of the attack, Jordan was on conditional release from Saint Elizabeths Hospital, where he had been committed two decades earlier following his acquittal, by reason of insanity, on a first-degree murder charge. Jordan's release from Saint Elizabeths was granted via a Superior Court order requiring that both Jordan and the D.C. Department of Behavioral Health ("DBH") comply with certain conditions, intended to ensure Jordan would "not pose a danger to himself or others" while living in the community. In the months preceding the shooting, DBH failed to perform several of the duties required by the court order. Most significantly, after Jordan tested positive on multiple drug tests, DBH failed to return him to Saint Elizabeths or even inform the Superior Court of those results.

Bhutto's widow, Nafisa Hoodbhoy, brought a wrongful death and survival action—seeking damages for Bhutto's emotional, psychological, and physical pain in his final minutes, *see* D.C. Code § 12-101—against the District. She claimed the District was liable for Bhutto's death because it negligently failed to comply with the conditions of Jordan's release, to warn Jordan's neighbors of his propensity for

violence, and to ensure that Jordan was not using illegal drugs or obtaining firearms. The trial court granted the District's motion to dismiss Hoodbhoy's complaint, finding that the District was shielded from liability by the "public duty doctrine," under which we have said that the District has "no general duty to provide public services, such as police protection, to any particular individual citizen," but owes such duty only to "the public at large." *Warren v. District of Columbia*, 444 A.2d 1, 3 (D.C. 1981) (en banc). Citing that doctrine, the court found that, "even assuming [] the District had a nondiscretionary duty" to abide by the conditions of Jordan's release, that duty was owed to the general public—not to Hoodbhoy or Bhutto as individuals. Therefore, the District could not be held liable for negligently failing to prevent Bhutto's death.

Hoodbhoy asks us to reverse. Specifically, she urges us to adopt one or both of two new exceptions to the public duty doctrine, either of which would allow her claims to proceed. Because neither exception is consistent with the doctrine's contours, we affirm.

**I.**

In 1998, a grand jury indicted Hilman Jordan for first-degree murder after he shot and killed his cousin.[1]  Jordan was found not guilty by reason of insanity and committed to Saint Elizabeths Hospital.  In 2003, Jordan was conditionally released from Saint Elizabeths, but was subsequently recommitted two years later, and placed in a maximum security ward, after illegally obtaining a firearm and bringing it to the hospital for the purpose of killing an acquaintance.  In 2015, Jordan was once again conditionally released.  Shortly thereafter, the Superior Court authorized Jordan's transition to full convalescent leave, issuing an order imposing nineteen conditions that Jordan and DBH were required to follow to ensure that Jordan was properly supervised.

Among the court-ordered conditions of release was a requirement that DBH conduct monthly drug screenings and, if Jordan ever refused to participate or tested

---

[1] We accept, as we must in considering a dismissal under Super. Ct. Civ. R. 12(b)(6), the allegations in Hoodbhoy's complaint as true.  *Hillbroom v. PricewaterhouseCoopers LLP*, 17 A.3d 566, 572 (D.C. 2011).  For the purposes of this opinion, we also adopt the allegations in Hoodbhoy's proffered amended complaint, bearing in mind that Super. Ct. Civ. R. 15(a)(3) demands that leave to amend a complaint be freely given "when justice so requires," and that the sole grounds on which the trial court denied Hoodbhoy's motion to amend her original complaint was that the public duty doctrine would bar her claims regardless.

positive, notify the court and immediately return him to Saint Elizabeths. In addition, the court order required that Jordan's case manager conduct at least two visits per week, submit monthly written reports to Saint Elizabeths and the court, and notify the court if Jordan was assigned a new case manager or core service agency.

When Jordan was released from Saint Elizabeths, he rented a unit in the condominium building at 2610 Wade Road SE. His unit was located directly above the unit owned and occupied by Nafisa Hoodbhoy and Jawaid Bhutto. In January 2019, Bhutto emailed members of the condominium board, complaining that Jordan was smoking cigarettes and marijuana, and that the stench permeated throughout his unit. Someone on the condominium board showed Jordan the email without redacting Bhutto's name or other identifying information. On March 1, 2019, Jordan approached Bhutto in the condominium building's parking lot, brandished a firearm, chased Bhutto into a corner, shot him, beat him, then kicked him twice in the head. Bhutto died later that day.

According to an internal DBH review, in the months preceding Bhutto's death, DBH failed to comply with five of the nineteen mandatory conditions set forth in the court order authorizing Jordan's release. The most concerning breach was

that, even though Jordan tested positive for marijuana on four occasions between June and August 2018, DBH failed to notify the court or return him to Saint Elizabeths as required. DBH also found that seven months preceding the shooting, DBH's contractor averaged only "weekly to bi-weekly" home visits, and that the agency failed to ensure that the contractor submitted its required monthly reports. Finally, DBH found that, though there was a change in Jordan's case manager and core service agency, the agency failed to notify the court.

Bhutto's widow, Hoodbhoy, brought a wrongful death suit against the District. In her complaint, she alleged that the District had "breached the duty owed to the public, including Mr. Bhutto" by: (1) recommending that the court release Jordan into the community and permitting him to live among members of the public, despite knowledge of his history of violence; (2) violating five of the nineteen court-ordered conditions of Jordan's leave; and (3) failing to use reasonable care to protect the public from Jordan by ensuring he was not consuming illegal drugs or illegally obtaining firearms and warning the public of Jordan's "violent and dangerous propensities." The District moved to dismiss the complaint for failure to state a claim. Hoodbhoy opposed the District's motion, and at the same time moved to amend her complaint with allegations relating to the results of DBH's internal review. The trial court granted the District's motion to dismiss, finding that the

public duty doctrine barred Hoodbhoy's claims. The court also denied Hoodbhoy's motion to amend her complaint, finding that her proffered amendments would be futile because the complaint would still fail to satisfy the requirements of the public duty doctrine.

## II.

We review de novo the dismissal of a complaint for failure to state a claim under Rule 12(b)(6). *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 543 (D.C. 2011). In conducting our review, we apply "the same standard the trial court was required to apply, accepting the allegations in the complaint as true and viewing all facts and drawing all reasonable inferences in favor of the plaintiffs." *Hillbroom v. PricewaterhouseCoopers LLP*, 17 A.3d 566, 572 (D.C. 2011).

For a claim sounding in negligence, like wrongful death, the plaintiff must show: "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011). When the District or its agents take action that "directly" harms an individual, the law of negligence applies to it as it would to any other tortfeasor. *District of Columbia v. Evans*, 644 A.2d

1008, 1017 n.8 (D.C. 1994).[2]   However, when a plaintiff alleges the "District negligently failed to protect [them] from harm," the first element of a negligence claim—duty—is governed by the public duty doctrine, under which the "government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen." *Klahr v. District of Columbia*, 576 A.2d 718, 719-20 (D.C. 1990) (quoting *Warren*, 444 A.2d at 4).  In any case where the public duty doctrine applies, "a person seeking to hold the District of Columbia liable for negligence must allege and prove that the District owed a special duty to the injured party, greater than or different from any duty which it owed to the general public." *Id.* at 719.  "Absent a special relationship between the District and an individual, no specific legal duty exists, and . . . a claim of simple negligence will fail as a matter of law." *Woods v. District of Columbia*, 63 A.3d 551, 553 (D.C. 2013) (cleaned up) (quoting *Warren*, 444 A.2d at 3, 4).

We have recognized that there are "at least two ways to demonstrate the existence of a 'special relationship'" between the District and an individual. *Turner v. District of Columbia*, 532 A.2d 662, 667 (D.C. 1987).  First, a special relationship

---

[2]  Even in those cases the doctrine of sovereign immunity may insulate the District from suit, though that doctrine is not at issue in this appeal.  *See generally Powell v. District of Columbia*, 602 A.2d 1123, 1126 (D.C. 1992).

can be established by "(1) a direct . . . or continuing contact between the victim and the governmental agency or official; and (2) a justifiable reliance on the part of the victim." *Platt v. District of Columbia*, 467 A.2d 149, 151 (D.C. 1983). To satisfy the first prong of *Platt*, a plaintiff must show that the District made contact with the injured party as an individual, not as part of a larger "segment of the public" such as "residents of a particular neighborhood, or . . . students and faculty members at a particular institution." *Varner v. District of Columbia*, 891 A.2d 260, 276 (D.C. 2006). Further, the contact must be "different from the type of contact that the District has with the general public." *Nealon v. District of Columbia*, 669 A.2d 685, 693 (D.C. 1995); *see also, e.g.*, *Wanzer v. District of Columbia*, 580 A.2d 127, 132 (D.C. 1990) (finding that a 911 call, while a contact with a private party, does not "exceed the response generally made to other members of the public").

Second, a special relationship can be established, in the absence of direct or continuing contact, via a statute or regulation that "describe[s] a special duty to a particular class of individuals." *Turner*, 532 A.2d at 667 (quoting *Morgan v. District of Columbia*, 468 A.2d 1306, 1314 (D.C. 1983) (en banc)). To create such a duty, a statute or regulation must contain "explicit language" protecting "members of a particularized class." *District of Columbia v. Forsman*, 580 A.2d 1314, 1317 (D.C. 1990); *see also Hines v. District of Columbia*, 580 A.2d 133, 138 (D.C. 1990)

("[P]ersons who are seriously ill or injured and who receive emergency medical care" are not a particularized class because "[v]irtually every citizen . . . could find himself or herself in need of assistance . . . at one time or another.").

While the public duty doctrine originated and developed as a judicially created precept, in 2015, we granted en banc review to consider "whether the public duty doctrine should continue to be recognized by this court." *See Allen v. District of Columbia*, 100 A.3d 63 (D.C. 2014), *vacated pending en banc review*, 2015 WL 5725532 (June 15, 2015); *see also id.* at 75, 95 (Easterly, J., dissenting) (describing the doctrine as "analytically bankrupt" and calling for this court "to put it to rest"). In response, and before the en banc court could consider whether the doctrine should endure (possibly in some altered form), the D.C. Council intervened and codified it into law in 2016. *See* D.C. Code § 5-401.02. In that legislation, the Council "ratifie[d] the interpretation and application of the public duty doctrine by the District of Columbia Court of Appeals up through the decision of September 25, 2014, in *Allen v. District of Columbia*, No. 10-CV-1425," thereby insulating the existing doctrine from our then-pending reconsideration. *Id*.

The effect of § 5-401.02 is (1) to resuscitate *Allen*, which we had vacated pending en banc review, as binding authority, and (2) to constrain this court from

overruling public duty doctrine precedents up to and including that opinion, such that we may not adopt new "exceptions" to the public duty doctrine that are incompatible with those previous rulings. Section 5-401.02 does not otherwise preclude us from further clarifying the contours of the doctrine in the same way we ordinarily refine common-law rules. Nor would § 5-401.02 prevent us from endorsing a new exception to the public duty doctrine, so long as that exception can be squared with our previous holdings.

## III.

Hoodbhoy does not dispute that her claim against the District is for negligently failing to protect Bhutto from harm.[3] Nor does she argue that she can demonstrate a special relationship between the District and either herself or Bhutto under the

---

[3] Hoodbhoy's complaint—in relevant part—alleges that the District, "[a]s the entity charged with the custody, care, control, and/or supervision of Mr. Jordan, . . . had the right and/or ability to protect the public from harm," but "fail[ed] to use reasonable care to protect the public, including Mr. Bhutto, from harm caused by Mr. Jordan." On appeal, she repeatedly emphasizes that the gravamen of her case is that the District was negligent because it "repeatedly violat[ed] a court order explicitly intended to protect members of the public from someone the District knew to be dangerous."

frameworks we articulated in *Platt* and *Turner*.[4]  Instead, she urges us to adopt either one or both of two proposed exceptions to the public duty doctrine, each of which would permit her claims to proceed.  First, Hoodbhoy suggests a "narrow exception to the public duty doctrine where the government negligently exposes foreseeable members of the public to harm by an inmate or patient [it] has reason to know is dangerous."  Second, Hoodbhoy asks us to "hold that the public duty doctrine does not apply when the District violates explicit public-safety provisions of a court order that afford it no discretion in fulfilling its duties to the public."  We consider each proposal in turn.

**A.**

We first consider Hoodbhoy's request that we carve out "a narrow exception to the public duty doctrine where the government negligently exposes foreseeable

---

[4] We agree with Hoodbhoy on this point.  As for *Platt*, Hoodbhoy alleges no contact (direct, continuing, or otherwise) with the District on the subject of Jordan's release that was "different from the type of contact that the District has with the general public."  *Nealon*, 669 A.2d at 693.  Nor does Hoodbhoy allege that either she or Bhutto justifiably relied on any representations made by the District with regard to Jordan. *See Morgan*, 468 A.2d at 1315.  As for *Turner*, even assuming that a court order is the equivalent of a statute or regulation for purposes of the public duty doctrine, the order here contains no "explicit language" describing any special duty to protect a "particularized class."  *Forsman*, 580 A.2d at 1317.

members of the public to harm by an inmate or patient [it] has reason to know is dangerous." As support for her proposed rule, Hoodbhoy points to *Klahr*, in which we found that the public duty doctrine barred a failure-to-protect claim after the District failed to properly supervise a resident in a government-run halfway house, who then "escaped" and murdered two members of the public. 576 A.2d at 718-19. In *Klahr*, we addressed a then-recent (though non-binding) case from the D.C. Circuit, which had held the federal government liable after it negligently allowed a patient with a history of deadly violence to escape hospital grounds and "brutally" attack his wife. *See White v. United States*, 780 F.2d 97, 98, 100-01 (D.C. Cir. 1986). We noted that the escapee in *White*, unlike in *Klahr*, had previously been charged with a "serious crime" (murder of a police officer, for which he was acquitted by reason of insanity) and was therefore "presumed by law to be dangerous." *Klahr*, 576 A.2d at 720-21 & n.7. We then qualified our holding in *Klahr*, stating that "we need not consider whether this court should create an exception to the public duty doctrine when *dangerous* patients or inmates escape from confinement." *Id*. at 721 (emphasis added). Hoodbhoy urges us to adopt a modified—and broader—version of that exception now.[5]

---

[5] In addition to *White*, Hoodbhoy points to *Smith v. Hope Village*, in which the federal District Court for the District of Columbia held that a *privately run* halfway house had a duty to the foreseeable victims of an escapee who was a "violent offender . . . with a long history of perpetrating burglaries." 481 F. Supp. 2d 172,

To craft an exception to the public duty doctrine that would permit liability in this case but not in *Klahr*, Hoodbhoy focuses on the concept of foreseeability. Her primary argument is that, due to Jordan's violent history, it was more foreseeable here than in *Klahr* "that upon his release he might pose a danger" to the community. Hoodbhoy also alludes to a further narrowing of this proposed carve-out—arguing that it was especially foreseeable that Jordan would harm those individuals, like Bhutto, who "lived in the same condominium complex" as he did.

To the extent Hoodbhoy relies on the foreseeability of harm to the general public, her proposed exception is incompatible with the public duty doctrine. Under the public duty doctrine, the District may not be liable for negligently failing to protect an individual from harm without a special relationship, such that the District's liability would be based not on a duty owed to the general public but on a duty owed to the injured party as an individual. *See, e.g.*, *Flemmings v. District of Columbia*, 719 A.2d 963, 964 (D.C. 1998) ("[L]aw enforcement officials and, consequently, state and municipal governments generally may not be held liable for

---

195 (D.D.C. 2007). But that case did not involve the public duty doctrine, as the defendant was not a government entity. Indeed, the key reasoning in *Smith*, that there was "no need to pinpoint with precise accuracy which individuals are owed a duty by the defendant, so long as [the court] can identify a class of individuals who might foreseeably be injured" because the defendant owed a duty to the "community at large," *id.* at 192-93, is fundamentally at odds with the public duty doctrine. *See, e.g.*, *Klahr*, 576 A.2d at 719.

failure to protect individual citizens from harm caused by criminal conduct" unless "there has been a special relationship between the District and the injured party, coupled with a reliance by the injured party on that relationship." (internal quotation marks removed)); *Hines*, 580 A.2d at 136 ("[A] government and its agents owe no duty to provide public services to particular citizens as individuals . . . absent some 'special relationship' between the government and the individual.").

Whether a special relationship exists turns on the distinction between duty to protect the public-at-large and duty to protect the injured party, not on the existence or nature of that duty in the abstract. In other words, no matter how obvious or great the general danger—or how blameworthy the District's omissions with regard to that danger—the public duty doctrine bars liability in a failure to protect case absent a showing that the District assumed a special duty to the injured party above and beyond what it owed the general public. *See Klahr*, 576 A.2d at 720 (emphasizing that the District had no "reason to believe that [the killer] posed a danger to the [victims] any greater in degree than, or different in kind from, the danger he posed to anyone else"); *see also Wanzer*, 580 A.2d at 132 ("It is not enough to allege ineptitude, even shameful and inexcusable ineptitude, by a municipal agency."). It is of no import, for purposes of the public duty doctrine, whether Jordan's history made him more likely to commit violent acts in general.

Hoodbhoy's narrower argument—that the greater risk to Jordan's neighbors created a special duty to those neighbors—raises a harder question because it suggests a distinction between a class of individuals and the general public.[6] That said, it would be the rare risk of public harm that was evenly distributed among all subsets of the population. While it is likely true that Jordan posed a greater risk to people living in the same condominium building than he did to the public at large, the same could be said of the people who lived on his block, in his neighborhood, near his work, in his quadrant, or even along the route of his commute.

The mere fact that the injured party comes from a subset of the population that was at higher risk of harm than the general public has never been enough, without more, to satisfy the public duty doctrine's requirement that the District owe a duty to protect the injured party as an individual. *See, e.g.*, *Nealon*, 669 A.2d at 693 (the District's decision to lower the water pressure in a neighborhood's fire hydrants rendered one of those hydrants inadequate to stop the spread of a residential fire in that neighborhood); *Forsman*, 580 A.2d at 1317 (the District's failure to enforce

---

[6] Hoodbhoy does not necessarily need to show that this case fits within either the *Platt* or the *Turner* framework. We have never held that those frameworks are the exclusive means for demonstrating a special relationship. *See Turner*, 532 A.2d at 667 ("[T]here are *at least* two ways to demonstrate the existence of a 'special relationship' between the city and the injured party." (emphasis added)).

permitting requirements led to the collapse of a home because of an unpermitted excavation); *Platt*, 467 A.2d at 150, 152 (the District's decision to allow a movie theater to continue operating despite certain building and fire code violations led to the death of several members of the public in a fire). Hoodbhoy offers no argument to distinguish her case from those precedents. Accordingly, we conclude that Hoodbhoy's first proposed exception to the public duty doctrine is incompatible with our precedents, and that we are therefore barred from adopting it here.

**B.**

Next, Hoodbhoy urges us to "hold that the public duty doctrine does not apply when the District violates explicit public-safety provisions of a court order that afford it no discretion in fulfilling its duties to the public."[7] This proposed exception is also incompatible with our precedents. It is true that we have occasionally justified the public duty doctrine by observing "the need for public employees to have broad

---

[7] Hoodbhoy also appears to suggest a broader rule—to "limit the public duty doctrine to the exercise of discretionary, as opposed to ministerial, functions." For the same reasons we reject Hoodbhoy's narrower modification (applying only to mandatory duties that are set forth in court orders), we also reject this broader proposal.

discretion in responding to" the demands of the public.[8]  *See, e.g.*, *Powell*, 602 A.2d at 1128 n.5.  Nonetheless, we have explicitly rejected the proposition that the public duty doctrine applies solely to discretionary acts.  *See id.* at 1127 ("The public duty doctrine . . . is not based on sovereign immunity considerations, but rather on whether, even if the acts involved are ministerial in nature, an actionable duty exists."); *Hines*, 580 A.2d at 137 (the public duty doctrine applies even though emergency medical providers "do not exercise discretion in carrying out their duties"); *Miller v. District of Columbia*, 841 A.2d 1244, 1248 (D.C. 2004) (the public duty doctrine applies even where the breach in duty is a "negligent misrepresentation of fact" rather than a "discretionary assessment of the rescue scene").  Hoodbhoy points to no contrary precedent in which we have suggested that a mandatory duty—if not defined as a duty to a particularized class as it was in

---

[8] It is also true, as Hoodbhoy points out, that several other jurisdictions have found that the public duty doctrine does not apply to mandatory (or "ministerial") functions.  *See, e.g.*, *Williams v. Mayor & City Council of Baltimore*, 753 A.2d 41, 59 (Md. 2000) ("[The public duty doctrine] applies to the discretionary acts of public officials.  It does not apply to public officials' ministerial acts."); *J.L. v. Barnes*, 33 A.3d 902, 916 (Del. 2011) ("[F]or the public duty doctrine to apply, the plaintiff's claims must be based upon the exercise of discretion on the part of the actor in his or her official capacity."); *see generally Allen*, 100 A.3d at 90-92 (Easterly, J., dissenting) (surveying the various reasons other jurisdictions have moved away from the public duty doctrine as it exists in the District).

*Turner*, 532 A.2d at 667—should be treated any differently under the public duty doctrine than a discretionary one.

Because Hoodbhoy cannot show that the District owed any duty to her or to Bhutto beyond what it owed the general public, the public duty doctrine bars her claims.[9]

**IV.**

We affirm the Superior Court's judgment.

*So ordered.*

EASTERLY, *Associate Judge*, concurring: Before Hilman Jordan killed Professor Jawaid Bhutto, the husband of appellant Nafisa Hoodbhoy, the government (according to the allegations in Ms. Hoodbhoy's complaint, which we must accept as true at this juncture) both knew Mr. Jordan could kill someone and

---

[9] Because we agree with the trial court that Hoodbhoy's claims would still be barred by the public duty doctrine even had she been permitted to amend her complaint, we conclude that the trial court did not abuse its discretion in denying her leave to do so.

knew it had specific obligations to supervise him while he was out in the community. Mr. Jordan had already shot and killed another person, had been committed to a psychiatric hospital for decades, had previously been conditionally released only to be rehospitalized after he obtained a gun with the apparent intent to use it to kill an acquaintance, and was only again released into the community on special conditions and subject to court-ordered supervision by District agents. But this time the District failed to fulfill its court-ordered obligations and Mr. Jordan killed again, shooting Professor Bhutto multiple times in the parking lot of his condominium building. Because of the public duty doctrine that this court created out of whole cloth decades ago and the Council of the District of Columbia recently codified in D.C. Code § 5-401.02 after this court signaled it might retire the doctrine, Ms. Hoodbhoy cannot seek to hold the District accountable for its alleged failure to protect her husband from the danger that Mr. Jordan posed—"no matter how obvious or great" that danger, "or how blameworthy the District's omissions with regard to that danger" were. See *ante* at 15.

Although I acknowledge this court is bound by our public duty doctrine, I continue to view it as "analytically bankrupt," *see Allen v. District of Columbia*, 100 A.3d 63, 75 (D.C. 2014) (Easterly, J., dissenting), *vacated pending en banc review*, 2015 WL 5725532 (June 15, 2015), and I find no reassurance in its codification by

the Council, which took place with little or no debate. But the doctrine, even as legislatively blessed, has its limits. It does not, for example, apply to "acts of ordinary negligence," "for which anyone—police or civilian—would be liable." *Warren v. District of Columbia*, 444 A.2d 1, 7-8 (D.C. 1981) (en banc). And where its reach is unclear, this court should not look to expand it. We should decline to apply the doctrine to claims of negligence that arise from various duties other than the duty to protect and we should freely exercise our authority to recognize additional exceptions to the doctrine where appropriate and compatible with our previous holdings. See *ante* at 11; *cf. Allen*, 100 A.3d at 65 (noting that the special-duty exception was but "*an* exception to the doctrine" (emphasis added)); *Klahr v. District of Columbia*, 576 A.2d 718, 721 (D.C. 1990) (acknowledging the court's ability to "create an exception to the public duty doctrine" but declining to do so in that case). After all, whether and when to insulate executive branch actors from judicial scrutiny and civil liability for acts that are negligent (or worse) are fundamentally questions of public policy that are supposed to be decided by the legislature, which, after public debate and input, enacts laws that reflect the will of the community. Although we are constrained to affirm the application of the public duty doctrine in this case, this court should act with the utmost restraint in applying the public duty doctrine beyond its preexisting boundaries and let the Council decide if access to the courts to hold the District and its agents accountable should be further

restricted.